Madden, Judge,
delivered the opinion of the court:
Plaintiff is a Maryland corporation which is a successor to a Delaware corporation, the succession having taken place May 8,1933, after the predecessor corporation had completed the construction of the Department of Commerce building under a contract with the United States. The predecessor corporation subcontracted the plumbing, heating, and ventilating work on the building to W. S. Loftis, who did business as the Loftis Heating and Plumbing Company. He assigned to the Fulton National Bank, of Atlanta, Georgia, any amount due him under his subcontract, as security for advances made by the bank to him. Loftis and the bank are the real parties in interest on plaintiff’s side of this case. The term “plaintiff” is used to describe either the Delaware or the Maryland corporation.
Plaintiff’s contract with the Government was dated April 2, 1929, and the price was $13,567,000. Plaintiff’s subcontract with Loftis was dated April 19,1929, and the price was $1,200,000. The building was completed within the contract time. Loftis was paid $1,239,400.03 by plaintiff, which sum included certain extras beyond the work originally subcontracted to him. He and the bank nevertheless claim, through plaintiff, considerable sums for work and materials which they claim were required of Loftis beyond what he in his subcontract and plaintiff in its contract agreed to do, and for which the defendant has refused to pay.
Such of these claims as plaintiff has seriously urged here will be taken up seriatim.
*280 Painting
There was an ambiguity in the words of the writing making up plaintiff’s contract with the defendant with regard to the painting of the mechanical equipment which fell within Loftis’ subcontract. Paragraph 4 of the specifications called for the doing of all work necessary to completion of the building “except elevator and a dumb-waiter system and exclusive of those items of work which are specified as not included, as indicated on drawings and specified herein”. Paragraph 5, in pertinent part, was as follows:
The following items of work will not be included in this contract: Models, Decorating and all Painting except all shop coats for all trades and field painting of structural steel.
On the other hand, many pertinent paragraphs of the specifications provided in detail for the exact manner in which a complete painting job was to be done upon the pipes and equipment whose painting is here in question. The provisions of the specifications relevant to this question are quoted in finding 5. The inconsistency of Paragraph 5 of the specifications with these other provisions was so patent that it might well have evoked an inquiry from prospective bidders, including plaintiff, as to what the specifications really meant. Plaintiff, however, though fully aware of the ambiguity, instead of asking for a clarification, protected itself by discussing the question with Loftis when the subcontract was under negotiation, and insisting upon the following statement in the subcontract:
It is also understood and agreed that all painting referred to in these particular paragraphs and these Addenda specified to be done by the Heating or Plumbing contractor, is to be done by this subcontractor.
We think that plaintiff, aware of an ambiguity, perhaps inadvertent, in the defendant’s invitation to a contract, could not accept the contract and then claim that the ambiguity should be resolved favorably to itself. In these circumstances plaintiff in legal effect agreed with the defendant, and required Loftis to agree with it, to do whatever painting the defendant intended by the specifications, if the language *281 of the specifications might reasonably be interpreted to express such an intent. The defendant intended that the painting should be done as provided in detail in the specifications. That is what plaintiff bound itself to do, and Loftis’ obligation was the same as that of plaintiff. Besides, it was provided in Paragraph 15Á of the specifications that the decision of the architects as to the proper interpretation of the specifications should be final. Neither plaintiff nor Loftis has any just ground of complaint 'as to the painting.
Installation of Additional Air Compressors
The contract provided for two separate air compressor rooms, one in the north section and one in the south. The purpose of the compressors was to eject sewage from receptacles which were below the level of the city sewers. The specifications did not state the number of compressors to be installed, but Paragraph 804, describing the control panel in each room, specified for each room two of each of the accessories to the compressors, such as automatic starters, pressure gauges, etc. The contract drawings described in finding 6, each purporting to show one of the two air compressor rooms, make it plain that there were to be two compressors in each room. Defendant’s Exhibit 8 shows two compressors in one room, with an arrow pointing to each, and the plural “compressors” as the legend. Exhibit 9 shows two compressors, though the legend, “Air Compressor”, is in the singular. Exhibit 10 shows the two compressors as 9 does, and each compressor bears the separate legend “Air Compressor”. Exhibit 11 shows two compressors, with no accompanying legend. Of the several references in the drawings and contract writings, all of which were to be taken into account in ascertaining the meaning of the contract, only the use of the singular word “Compressor” on the drawing which is the defendant’s Exhibit 9 would have any tendency toward the construction of the contract for which plaintiff contends. Even on that drawing, the singular word in the legend was written across a figure of two compressors. We think the meaning of the contract was plain from the writings and drawings, and the in *282 stallation of,two compressors in each of the two compressor rooms was no more than plaintiff was legally bound to do. It may not, therefore, recover extra compensation for doing so.
Sewing on of Canvas Covering on Pipes
The contract required that certain pipes be covered with canvas. Employees of Loftis mistakenly covered additional pipes, and his superintendent did not notice that they were doing so. Loftis had the work stopped as soon as he learned of it. He claimed $10,450.17 for the extra work, and plaintiff asked that the claim be considered. The architects advised plaintiff that their estimate of the cost was only $1,734.56, and that they would recommend the allowance of a claim for that amount plus overhead and profit. This was done, but the Treasury Department rejected the claim because no change order had been given as required by the contract.
Loftis, by mistake, conferred upon the defendant an unrequested benefit by covering pipes which were not included in the contract. No legal duty to pay for this unrequested work arises out of these facts. The defendant was within its rights in refusing to pay for it.
Radiator Valves
The contract provisions relating to radiator valves are' quoted in finding 8. Loftis had received, on March 22, 1929, a quotation of $41,000 from the manufacturers of the “Sterlco” valve, for the valves needed on this contract, and he submitted a valve of that make for test by the Bureau of Standards, as the contract required. The architect objected to the valve because of its mechanical construction and its shape, and the manufacturers redesigned the valve to meet these objections. As rédesigned it was submitted to the Bureau of Standards for testing, where it failed to control the temperature within a range of one degree, as required by the specifications. The architects thereupon rejected the Sterlco valve. Plaintiff submitted other valves, but they were rejected for failure to meet structural requirements. On October 23,1930, the architects recommended to the Treasury Department *283 that, since the valves plaintiff had submitted did not meet the specifications, the Government should proceed under Paragraph 660 of the specifications and designate a valve to be installed. They recommended that plaintiff be directed to install a make of valve whose trade name was “Direct Control.” The Department, on October 25, instructed the architects to have the Direct Control valve submitted for testing by the Bureau of Standards, and plaintiff, being notified of this, submitted that valve for testing. On January 20, 1931, the Bureau of Standards made a report to the Treasury which showed that the Direct Control valve had failed to meet the test.
On February 26, 1931, Loftis, not having been advised that the Direct Control valve had so failed, notified plaintiff, and plaintiff notified the .defendant, that he, Loftis, had placed his order for Direct Control valves. Thereupon the Department wrote the architects authorizing a modification of Paragraph 1104 of the specifications and directing the installation of the Direct Control valves. On March 5,1931, the architects wrote plaintiff, directing him to use the Direct Control valves. Loftis objected, unless the defendant would waive the Bureau of Standards test and the guaranty of successful operation which was in the contract. The architects, without mentioning these requested waivers, again directed -the installation of the Direct Control valve, and that was done, at a cost to Loftis of $55,000, as compared with the $41,000 which the Sterlco valves would have cost, and which was the amount which Loftis and plaintiff had estimated for this purpose when they had made up their bids.
We think that the defendant did not deal fairly witli Loftis in the valve transaction. When the Direct Control valve failed to pass the Bureau of Standards test, the defendant’s representatives made up their minds that the specifications had been written too rigidly, and that there was no valve on the market that would meet the specifications. They therefore decided to insist on the Direct Control valve which, their experience showed, would give the best all-around performance. This amounted to a change of the contract. But there were two parties to the contract, and Loftis, in plaintiff’s right, was entitled to know *284 the relevant facts and to be consulted about the change, since he was to perform the changed contract. He was entitled to know that the Direct Control valve had failed to pass the test and was therefore, so far as the original specifications were concerned, no better than the Sterlco, though it cost $14,000 more. If he had known that, it is hardly likely that he would have willingly incurred the additional cost. He was entitled to know that the defendant, in directing him to install the Direct Control valve, was not acting pursuant to Paragraph 660 of the specifications, which would have permitted the defendant to specify the valve to be installed, after the contractor had submitted one which did not meet the specifications. This paragraph did not authorize the defendant to specify another valve which, as it knew, also did not meet the specifications.
What the defendant did was to discard the specifications and, on a wholly different basis, viz, its opinion as to which was the best all-around performance valve, require the installation of that valve. If it had written the contract that way in the first place, Loftis would have estimated for that valve, and his estimate would, presumably, have been $55,000 instead of the $41,000 which he did estimate. The defendant’s unilateral modification of the contract cost him that much, and the defendant should reimburse him. No problem is present as to the lateness of plaintiff’s claim, since Loftis did not even learn the facts on which the claim is based until long after the contract had been completed.
Recovering Boilers
Plaintiff asserts that, although Loftis covered the boilers with the mixture of asbestos and Portland cement called for in the specifications, the defendant required Loftis to remove this covering and replace it with another mixture. Plaintiff sues for the cost of this extra work, which was $905.14.
The specifications for covering the boilers with asbestos •are quoted in finding 9. The language in question is in Paragraph 1136 of the specifications, and is as follows: “and last shall be one-half Portland cement”. Loftis’ *285 workmen took this language to mean one-balf by volume,, and applied such a mixture. The mixture was too hard, and the coating cracked badly, whereupon the architects required its removal and replacement by a mixture of about one-fourth Portland cement and three-fourths asbestos by volume. If Loftis’ workmen had mixed the materials by weight, instead of by volume, the one-half of cement, by weight, would have been about one-fourth, by volume, since the asbestos ingredient was much lighter, and this mixture would have been satisfactory. The defendant contends that Loftis should have known that the mixture by volume would be improper, and hence should have made the mixture by weight. The architects’ representative who supervised the work for the defendant testified that specifications for mixtures of cement as ordinarily written mean parts by volume. We think that Loftis’ men acted reasonably in reading the specifications as'they did, in view of this custom, and had a right to suppose that the defendant wanted the result which the specifications would produce. To be sure, if Loftis’ men had known better, they should have inquired as to whether a mistake had been made, just as if the defendant’s inspector had happened to observe the-mixture, and had known that the result would not be right, he should have given instructions for a proper mixture. In the circumstances, we think the fault was the defendant’s in writing the specifications wrongly, and that it should pay for correcting the mistake.
Plaintiff made no claim for this extra work until June 1982, after the work was completed. Plaintiff asserts, and we have found, that there was an understanding between Loftis and the representative of the surety company which took control of Loftis’ work while it was still in progress, on the one hand, and Kramer, the representative of the architects, on the other, that Loftis would do whatever was directed by the architects, and would withhold claims, for extra work until after the job was completed. On June 20,1932, plaintiff forwarded to the architects a considerable number of claims, including the one for recovering boilers, and others hereinafter discussed. The architects considered these claims on their merits without any assertion that they *286 were late, and made adverse recommendations on them to the Treasury Department. A hearing was held before the Assistant Secretary of the Treasury in 1933, at which representatives of both parties appeared. Again, no objection on account of lateness was made to the presentation of the claims. On June 5, 1934, the Department rejected the claims. In these circumstances the lateness of presentation of the claims to the architects did not foreclose plaintiff. Thompson v. United States, 91 C. Cls. 166, 179.
The defendant does not urge that the Department’s determination was, under Article 15 of the contract, final. It is not, therefore, necessary for us to determine whether the language of that article is applicable to the questions presented here, or any of them. We have, therefore, decided the several claims on their merits.
Floor and Ceiling Plates
The defendant’s architect requested plaintiff to revise its original drawing to show nickel-plated floor and ceiling plates around pipes. The contract did not call for nickel-plated plates. Loftis made the change, and installed the kind of plates requested, without then making any protest or claim for additional compensation. The additional cost of the plates because of the nickel plating was $543.58. The defendant’s architect testified that he regarded this change as covered by a change order which related primarily to other fixtures, but the defendant does not urge that contention here. It relies solely on the lateness of plaintiff’s claim, which was not made until June 1932, after the completion of the contract. As to the lateness of the claim, what we have said above in relation to the recovering of the boilers is applicable, and plaintiff may recover its additional cost.
Clean-out Plates
Plaintiff claims that it was required to use chromium plated clean-out plates, and that it should be paid the extra cost of the chromium plating, as that was not required by the contract. We have found that this alleged extra cost *287 was covered by an extra order given and paid for by the defendant, requiring chromium plating on metal in the toilet rooms. Plaintiff is not entitled to recover for this item.
Cleaning Traps
Some traps in the heating system did not operate properly, and the defendant required plaintiff, pursuant to its guaranty, to go over them. In some of them elements were missing and these were installed. All were cleaned. Some months later there was further trouble and the defendant again required plaintiff to clean the traps. Plaintiff urges that the trouble which gave rise to the second cleaning was that the defendant caused the return pipes to be covered, which prevented the steam from condensing, thus interfering with the operation of the traps. The defendant later removed the covering from the return pipes. The basis of plaintiff’s claim is that the second cleaning required of it under its guaranty was unnecessary and useless, since it had no relation to the trouble. Article 14 of the specifications, quoted in finding 14, lodged broad discretion in the contracting officer as to determining plaintiff’s duty under its guaranty. It concludes with this language:
The opinion of the contracting officer as to the liability of this contractor under any such guarantee or as to the satisfactory fulfillment or compensation for nonfulfillment thereof shall be final.
The contracting officer concluded, not unreasonably we think, that the second cleaning was called for under the guaranty. We have doubts as to whether he was right, but whichever way we might resolve our doubts, plaintiff could not recover, in view of the language quoted.
Vent Pipes for Dishwashing Machine
The contract called for the installation of a dishwashing machine. It is not good practice to connect the vents for exhaust steam from such a machine with the ventilating system of a kitchen, hence such a connection was not called for by the contract, which contained no language specific *288 to the problem. Loftis, however, furnished the architects a shop drawing showing the machine connected with the ventilating system. Loftis was in error in so making the shop drawing and, when he installed the machine, he did not make the connection, and objected to being required to do so. He was, however, directed in writing to make the connection, which he did at a cost of $103.00. The arrangement did not work, and the connection was later removed. Plaintiff made a written claim for this item, which was rejected by the architects. He again included this claim in the group presented in June 1932, and it was dealt with in the way we have described above in connection with the claim for recovering the boilers. Plaintiff may recover on this item.
Yent Pipes for Steam Kettles
Practically the same things happened concerning the steam kettles as we have described in connection with the dishwashing machine, except that here Loftis made no shop drawing showing connections with the ventilating system. He was, however, ordered to make the connection, which he did at a cost of $475.00 and, the arrangement proving unworkable, the defenuant later removed the connection. There was a claim, a rejection, and a renewal of the claim as in the case of the dishwashing machine. Plaintiff may recover.
We have, as appears above, concluded that plaintiff may recover on its claims for radiator valves, recovering boilers,, floor and ceiling plates, and connecting the dishwashing machine and steam kettles with the ventilating system. The several amounts, with allowances for overhead and profit, where proper, total $16,452.33, and for this amount plaintiff is entitled to a judgment. It is so ordered.
Jones, Judge; Whitaker, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.