Madden, Judge,
delivered the opinion of the court:
The plaintiff sues for the extra costs which it incurred because, it says, it was required to use different and more expensive material than that called for by its contract with the Government, and was required to perform work and furnish material in addition to that called for in the contract.
By the contract in question which was dated March 23, 1948, the plaintiff agreed to build a hospital for the Veterans Administration at Albany, New York, for a lump sum which, by later amendment, was fixed at $10;086,007.84. Detailed specifications were included in the written contract. The plaintiff interpreted the contract as permitting it to use gypsum tile instead of the more expensive hollow clay tiling in the construction of “furring” at exterior walls and around steel columns.
The pertinent provisions of the specifications are reprinted in our finding 4. Section 5-03 (e) provided that gypsum tile could be used, at the contractor’s option, for interior nonbearing partitions. Section 5-06 (c) bore the heading *733 Structural Clay Tile or Concrete Masonry Units. (1) Partitions. It then provided how partitions were to be built. In paragraph (3) Furring it provided how furring was to be built.
The plaintiff’s claim in this regard is that “furring,” as that word was used in the contract, was a type of interior partition and therefore subject to the option in Section 5-03 (e) for the use of gypsum tile.
The “furring” contemplated by the contract was a non-bearing wall located at a specified distance, perhaps two feet, from an exterior wall, and anchored to that wall by metal ties not over two feet apart on center. In the space behind the furring wall, pipes were concealed. The air space behind the wall would also act as an insulator of the room from outside temperature and from dampness in the wall. The furring around columns was also set a few inches out from the columns and there could be pipes in the intervening space.
As we have said, the plaintiff urges that these furring walls were partitions. Ordinarily, partitions separate one considerable space from another, as in the case of partitions between rooms. We see no reason why the small volume of the space on one side of a wall should remove that wall out of the definition of a partition. These furring walls carried no load, the furring wall at the exterior wall of the building just made another side of the same room, two or three other admittedly partition walls of which constituted the enclosures of a room. We can think of no reason why one of the walls should be of different materials from the others.
The Government says that the heading of Section 5-06 (c), in which furring is mentioned is Structural Clay Tile or Concrete Masonry Units. So it is, but the first paragraph in it relates to partitions and the earlier section expressly provides that gypsum block may be used in interior nonbearing partitions. The heading is therefore inaccurate. The specifications are ambiguous; they were written by the Government; the plaintiff’s interpretation of them is reasonable and should prevail. The plaintiff is entitled to $38,654.21 on this item of its claim.
*734 The second item of the plaintiff’s claim depends upon the application of another sentence in Section 5-06 (c) of the specifications.. It says:
Partitions around elevators, stair and pipe shafts, shall be continuous from floor to the underside of the floor construction above. * * * partitions in spaces other than the above may be stopped approximately 4 inches above the ceiling level unless indicated to be otherwise.
The floor above was concrete, and the ceiling of the room below was suspended from hangers anchored in the concrete, so that there was a space of perhaps 16 or 18 inches between the ceiling and the floor above. The plaintiff was required to carry the furring around the columns to the floor-slab above, rather than to stop it four inches above the suspended ceiling level. The plaintiff says that the specific provision quoted above about partitions around elevator shafts, etc., and the provision- about “spaces other than the above” show that the plaintiff was required to do more than the contract called for.
Our conclusion that the furring around the columns fell within the definition of “partitions” would seem to justify the plaintiff’s interpretation. The Government introduced evidence that it was common knowledge in the construction industry that steel columns should be covered throughout their entire length to prevent them from buckling under direct exposure to flames in case of fire. The plaintiff says that that fact of common knowledge is irrelevant, that the specifications do not require what the Government insisted on, and that it must be paid for as an extra. With some hesitation, we conclude that the plaintiff was required to carry the furring to the floor above, in spite of the omission in the specifications. A bidder should call attention to an obvious omission in a specification, and make certain that the omission was deliberate, if he intends to take advantage of it. On this claim the plaintiff can recover only the difference between the cost of gypsum blocks and clay tile, $3,131.59, for the extension of the furring to the floor slab above.
The third item of the plaintiff’s claim is for the “pointing” of the masonry walls in the elevator and dumbwaiter shafts. *735 The specifications did not require that these walls be carefully pointed, since they were not to be exposed. The defendant’s inspectors orally required that the walls be pointed, and this was done. A written direction was given to the plaintiff which purported only to require it “to fill all voids in masonry joints and holes in masonry partitions” in the elevator and dumbwaiter shafts. There were some holes in the walls of these shafts where scaffolding had been removed, and the plaintiff does not claim any amount for filling those holes. Otherwise the masonry work in them had been done in accord with the specifications, and the plaintiff is entitled to recover the cost of the pointing, plus a profit of 10 percent on that cost, a total on this claim of $3,654.19.
The plaintiff may have a judgment for $45,439.99.
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, a stipulation of the parties, and the briefs and arguments of counsel, makes findings of fact as follows:
1. King Construction Corporation is a corporation organized and existing by virtue of the laws of the State of Delaware, with its principal office at Minneapolis, Minnesota. It is engaged in business as a general contractor for the construction of buildings.
2. On March 23,1948 plaintiff entered into a contract, designated by number W-30-076-Eng.-3631, with the Department of the Army acting through the District Engineer, Corps of Engineers, New York District, pursuant to which plaintiff agreed to furnish the materials and perform the work for the completion of the main hospital and utility wing for the Veterans Administration Hospital, Albany, New York, as set forth and described in the specifications attached to and forming part of the contract. The original contract consideration was $9,644,000.00, which amount by reason of contract modifications and change orders was increased to the total sum of $10,086,007.84.
*736 3. After plaintiff was awarded a contract to construct, for defendant, the project described as “buildings and utilities” for a Veterans Administration hospital at Albany, New York, the Lichter Foundation, Inc., was employed to perform management and supervisory services in connection with the masonry work on the hospital building. This claim is for expenses incurred in connection with the masonry work which is deemed by plaintiff to be in addition to what was called for by the contract. There was no privity between the Lichter Corporation and the defendant but the defendant insists that such firm was, in reality, a sub-contractor of plaintiff and consequently the real party in interest in this action. There has been no formal assignment of plaintiff’s claim against the defendant but plaintiff admits that the Lichter Foundation has a financial interest in any amount which may be recovered through this suit.
4. Plaintiff’s suit concerns work performance under section 5 of the contract specifications, pertinent parts of which are set forth as follows:
Section 5.
MASONRY

Brick, Structural Tile, and Concrete Block

5-01 Scope
5-02 Applicable Specifications 5-03 Materials
(a) Anchors and Ties
(b) Brick
(c) Concrete Masonry Units
(d) Flue Lining and Thimbles
(e) Gypsum Partition Tile
(f) Mortar Materials
(g) Structural Clay Tile
5-04 Samples
5-05 Handling and Storage 5-06 Erection and Workmanship
(a) General
(b) Brick
(e)Structural Clay Tile or Concrete Masonry Units
(d) Laving Structural Glazed Units
(e) Cutting and Patching
(f) Unfinished Work
(g) Protection
(h) Pointing and Cleaning
(i ) Chases for Mechanical Lines etc.
Controversy between the parties has specific reference to the following sub-sections of the Specifications:

*737
Section 5-03 Materials

(e) Gypsum Partition Tile. Gypsum partition tile shall conform to the requirements of Federal Specifications SS-T-316. Gypsum tile may be used, at the contractor’s option, for interior partitions except that none shall be used in the first course of any partition, nor in bearing partitions, fire walls, elevator and stair enclosures, basements, bath or toilet partitions, or in any partition on which cement or lime plaster base coat is to be applied.

Section 5-06 Erection and Workmanship

(b) (3) Joints. All face brick joints throughout the work shall be rodded with a round rod approximately V/p inch in diameter, so as to provide a slightly concave joint that will seal the mortar against the upper and lower front edge of each brick at joints. The rodding of mortar shall not be performed until the mortar has partially set. Brickwork for any interior wall surfaces not specified to be plastered shall be cut off flush and not rodded.
(c) Structural Olay Tile or Concrete Masonry Units. (1) Partitions. Partitions in general shall be 4 inches thick, except where indicated to be otherwise. Partitions around elevators, stair and pipe shafts, shall be continuous from floor to the underside of the floor construction above. Where suspended ceilings are indicated on the drawings, the partitions in spaces other than the above may be stopped approximately 4 inches above the ceiling level unless indicated to be otherwise.
All partitions shall be bonded or anchored into the adjacent masonry with wire mesh, corrugated metal, bar or tie rods in every course, extending into concrete, brickwork, or structural tile as required by the Contracting Officer. All joints at ceiling level shall be slushed full of mortar on both sides.
(3) Furring. Furring units, unless otherwise shown, shall be 3 inches thick, laid with cells vertical except at lintel and window sills. Unless otherwise shown on the drawings or required, the units shall be returned on the jambs and other reveals, and around all projections that are indicated as furred with tile on the drawings. All furring tile shall be anchored to the wall masonry or concrete with metal ties spaced not over 2 feet on centers in both directions and built in so as to coincide with the joints in the furring tile. Furring around columns and *738 for pipe space enclosures shall not be bonded to other masonry but shall be anchored thereto by the use of metal ties. Columns shall be furred with masonry units not less than 3 inches in thickness.
(h) Pointing and Gleaning. At completion of the work, all holes in joints of exposed masonry surfaces shall be pointed by completely filling with mortar. After pointing, all exposed masonry surfaces shall be wetted and then cleaned with a solution of 10 percent by volume of muriatic (hydrochloric) acid, applied with stiff fiber brushes leaving the masonry clean, free of mortar daubs, and with tight mortar joints throughout. Immediately after cleaning, the masonry surfaces shall be rinsed down with clear water.
(i) Chases for mechanical lines left in concrete walls or piers in the sub-basement by prior contractors shall be furred as directed by the Contracting Officer after the installation of the mechanical lines.

Claim No. 1. Difference in cost of using hollow tile instead of gypsum Mocks in certain areas

5. Plaintiff contends that the contract specifications (sec. 5-03e) gave it the option of using Gypsum blocks in the construction of certain areas but that defendant required it to use hollow clay tile for the purpose, and that because of this requirement and the greater cost of hollow clay tile it incurred excess costs in the amount of $40,188.92.
6. On January 6, 1949 plaintiff submitted to the District Engineer at Albany, New York, a series of field drawings showing detail of construction of various items of masonry work, and included a number of questions concerning specific matters upon which it desired approval or instructions.
Plaintiff contends that apart from the questions posed, the field drawings submitted showed the use of Gypsum blocks in places typical of the claims here in suit.
7. On March 6, 1949 plaintiff, in conversation with defendant’s resident engineer on the project, discussed the subject of the use of Gypsum blocks as they were shown on the above-mentioned drawings and the resident engineer advised plaintiff that it would be well for him to obtain specific approval of the District Engineer for the use of Gypsum blocks in the locations where plaintiff intended to use them. Accordingly, plaintiff wrote the following letter to the contracting officer on March 7,1949:
*739 TMs is to advise you that we intend to use Gypsum Partition Tile specified as an option for interior partitions and encasing steel columns, in accordance with paragraph (e) on page 5-4 of the specifications, except the bottom courses.
The contracting officer replied to plaintiff’s letter on March 14,1949 as follows:
Reference is made to your letter of March 7, 1949 advising that you intend to use Gypsum Partition Tile for interior partitions and encasing steel columns in accordance with paragraph 5-03e of the specifications.
Gypsum Partition Tile for interior partitions subject to the conditions outlined in the above-noted paragraph complies with the specifications. Your attention, however, is directed to the fact that Gypsum plaster will be required for the Gypsum Tile Partitions.
Your interpretation of the subject paragraph with regards to the use of Gypsum for encasing steel columns is incorrect. Your attention is directed to paragraph 5-06c (3) which states “Columns shall be furred with masonry units not less than 3 inches in thickness”. This is a sub-paragraph to 5-06c entitled Structural Clay Tile or Concrete Masonry Units. Therefore, the'masonry units specified in the above quoted sentence must be either structural clay tile or concrete masonry units and not Gypsum blocks.
8. Plaintiff again wrote to defendant on March 17, 1949, as follows:
We note you state in the third paragraph of your letter that inasmuch as paragraph 5-06c (3) states “Columns shall be furred with masonry units not less than three inches of thickness”, that inasmuch as this is a sub-paragraph to paragraph 5-06c entitled Structural Clay Tile or Concrete Masonry Units, that the column furring therefore must be either Structural Clay or Concrete Masonry Units and not Gypsum blocks. It is our interpretation that the paragraph you refer to which states that masonry units for columns is required, that as Gypsum block is a masonry unit and as such should be permissible to be used as furring for columns.
We also wish to refer you to paragraph 5-03e on Page 5y4 headed Gypsum Partition Tile. This paragraph gives us the option to use Gypsum Tile for interior partitions excepting certain specific places where the same is not permitted. It is our interpretation that the tile *740 walls around the columns are a part of the partitions forming the various rooms and hence are partitions, and as such specifications permit the use of three inch Gypsum Tile for the column furring.
Defendant replied that it did not concur with plaintiff’s interpretation of paragraphs 5-03e and 5-06c (3) of the specifications, but stated that column fireproofing could be accomplished by using 4 inch solid Gypsum Tile in lieu of the masonry units specified, at no change in cost to the Government.
On April 21, 1949, plaintiff advised the District Engineer that in accordance with the drawings submitted by it on January 6, 1949, it was proceeding with the installation of the 3 inch partition bordering the outside walls, using hollow Gypsum Tile except for the base course and the furring of the columns and behind marble. The District Engineer’s response to this letter dated April 26, 1949, is quoted in pertinent part as follows:
This office is not in agreement with the statement made in paragraph 3 of your letter to the effect that the furring on the outside walls is construed to be a partition, and can, therefore, be constructed of Gypsum Tile. This item is definitely a furring construction and does not come under the option of interior partitions as noted in paragraph 5-03e of the specifications. Subject furring is to comply with the requirements of paragraph 5-06c (3). Your attention is further directed to the fact that the drawings submitted under date of 6 January 1949 and returned by our letter dated 23 March 1949 were not approved. The information contained therein was for clarification purposes and does not relieve you from responsibility for complying with the plans and specifications and modifying orders from this office.
9. Thereafter plaintiff proceeded with the work, using Gypsum blocks in the construction of interior non-load-bearing partitions, and hollow tile or concrete blocks in the furring or partitions at exterior walls and at interior and exterior columns.
10. The terms “partition” and “furring” are not defined in the contract documents. Webster’s New International Dictionary (2nd edition) contains the following (architectural) definition of the words:
*741 Partition. That which divides or separates; that by which different things, or distinct parts of the same thing, are separated; specif., an interior wall dividing one part of a house, an enclosure etc., from another; as, a brick partition.
Furring, (a) Act of applying thin wood, brick or metal to a wall, beam, or the like, to level a surface as for lathing, boarding or plastering etc., or to make air space or to make a wall thicker in appearance and the window jambs deeper.
(b) The material so applied.
The above definition of “furring” appears to be more restrictive than its meaning as used in the construction industry, since it is possible for furring to be separated from the other wall as much as two-and-a-half feet, and the specifications now under review provide that furring units shall be three inches thick.
In Saylor’s Dictionary of Architecture (1952) a “partition” is defined: “Partition, a wall dividing interior space.”, and “furring” is defined: “Furring, the separation of an inner wall surface from the main wall behind it, to secure air space between them, or to modify the inner perimeter.”
In the construction industry the term “furring” is not generally used alone but in conjunction with another word with reference to that construction which separates or encloses space, as “wall furring”, “column furring”, “partition furring” etc.
11. Paragraphs (1) and (3) of subsection 5-06 do not cancel or qualify the provisions of subsection 5-03e which latter refers to the quality of Gypsum block and an option for its use.
12. The instructions of the contracting officer to use hollow building tile in the construction around columns and at pipe spaces were contrary to the requirements of the specifications, and the plaintiff in complying with these instructions incurred additional expense in the difference between the cost of hollow'building tile and Gypsum block which amounts to 14 cents per square foot. This difference in the cost per square foot is not in dispute, and the parties have agreed that the area involved in plaintiff’s claim No. 1 is 267,367 square feet and that all calculations in which the number of *742 square feet of the area is involved shall be based upon that figure.
Based on the agreed measurement and a cost differential of 14 cents per square foot, plaintiff’s additional cost in the first claim due to use of hollow tile is shown as follows:

*743

13. It is not established by the evidence that plaintiff’s bid estimate, on which the contract was awarded, was based upon the use of Gypsum block in the areas herein involved.

Claim No. 8. Cost of extending enclosures at eol/umn and pife spaces to concrete slabs above ceili/ng

14. Plaintiff contends that the contracting officer required it to extend masonry work enclosing columns and pipe spaces at columns to the floor slabs above instead of to approximately four inches above suspended ceilings; that this was contrary to the requirements of the contract specifications, and that in complying with the instructions of the contracting officer it incurred additional expenses in total amount of $17,368.87.
15. The pertinent specifications are in Section 5-06c:—
(1) Partitions. * * * Partitions around elevator, stair and pipe shafts shall be continuous from floor to the underside of floor construction above. Where suspended ceilings are indicated on the drawings, the partitions in spaces other than the above may be stopped approximately four inches above the ceiling level unless indicated to be otherwise. * * *
(3) Furring. * * * Columns shall be furred with masonry units not less than three inches in thickness.
16. Masonry construction around columns, sometimes referred to as furring, is of fireproof material and is designed as a measure of protecting steel columns from direct exposure to flames in case of fire. For this reason it is essential that the fire-proofing of columns should extend the full length of the column. It is common construction practice to carry such furring from one floor to the floor above without regard to the ceiling level, and without specific instructions that this should be done.
*744 17. Actual construction of the furring around interior columns was not contiguous to the steel columns but extended in area from two inches to three or four feet so as to include pipe risers which had previously been installed by mechanical trades.
In the exchange of correspondence concerning the optional use of Gypsum blocks hereinabove set forth, plaintiff also advised the Contracting Officer that “It is our interpretation that the tile walls around the columns are a part of the partitions forming the various rooms and hence are partitions, and as such, specifications permit the use of three inch Gypsum Tile for the column furring.” This interpretation was not concurred in by the contracting officer and plaintiff was so advised by letter dated April 4,1949, which reads, in part, as follows:—
You are advised that this office does not concur in your interpretation of paragraph 5-OBe and 5-06c (3) of the specifications as to the fireproofing of columns. However, column fireproofing may be of 4" solid Gypsum Tile in lieu of the masonry units specified, at no change in cost to the Government.
Gypsum Tile may be used on partitions subject to the following condition: Partitions constructed of Gypsum Tile shall extend to the underside of the construction above.
On April 20, 1949, the contracting officer amended the above letter, as follows:
Paragraph 3 of that letter, which states that “partitions constructed of Gypsum tile shall extend to the underside of the construction above” is modified to the extent that dividing partitions may be carried to 4" above the hung ceiling.
Corridor partitions shall be constructed to underside of construction above, as previously ordered.
18. Plaintiff proceeded to perform the work and, on November 2, 1949, submitted to defendant a statement of costs involved. This statement was revised and superseded by (cost) Proposal Summary # 120 dated February 7, 1950 which included, as Item # 1, the costs incurred in extending the corridor partitions, and as Item # 2, the cost incurred in the column fireproofing, both as to the carrying of the work to the concrete slab above.
*745 Item # 1 was approved and subsequently paid by defendant.
With respect to Item # 2, the contracting officer denied plaintiff’s claim by letter dated May 10,1950, as follows:
Your attention is called to the fact that furring around steel columns is a fireproofing measure which to be effective must extend the full height of the column. This is a basic and accepted practice. There is no provision in the specifications which would permit furring of only a portion of the column. The provisions of paragraphs 5-06c (1) of the specifications refer only to partitions, as the heading denotes, and do not apply to furring which is covered separately in Paragraph 5-06c (3). Accordingly your claim for additional compensation for carrying the fireproofing of interior columns to underside of the upper slabs is denied.
19. Although there is no provision in the specifications which states that furring of steel columns shall be carried to the full height of the column, it is common knowledge that coverage of less than the full height would provide incomplete and inadequate protection from fire hazard.
With respect to the materials required to be used in the construction of such furring the specifications provide only that masonry units not less than 3" in thickness shall be used. Gypsum blocks are included in the category of masonry units in the specifications, (5-02, 5-08e) and there is no specific provision which prohibits their use in the furring of columns, or which requires that such furring be of hollow tile.
20. In the extension of furring of the columns from 4" above the hung ceilings to the concrete slabs above, plaintiff used 19,320 square feet of hollow tile and 2,451 square feet of cinder block, the cost of which was 14 cents per square foot greater than that of Gypsum block. Based on this measurement and cost differential, plaintiff’s additional cost in this second claim is as follows:

*746
Claim, No. 3. Pointing of elevator and dumbwaiter shaft walls

21. In tbe construction of the elevator and dumbwaiter shaft walls plaintiff’s mechanics completed each course by drawing a trowel across the face of the material to remove excess mortar. The effect of this is known as a “cut-off joint” which usually leaves a rough appearance, sometimes leaving small holes or voids in the mortar surface. Unless the specifications provide otherwise it is customary to use a “cut-off joint” on walls which are unexposed or concealed.
22. The work of constructing the elevator and dumbwaiter shafts proceeded without objection by defendant to the use of cut-off joints, and was completed, except for the 11th floor (on which the work was temporarily delayed by work of other tradesmen) by September 1950.
During the last week of September 1950 defendant’s inspectors advised plaintiff informally that the Corps of Engineers was not going to accept the work as it had been completed, and that plaintiff would be required to “point” the shaft walls.
23. Plaintiff had further discussion of the matter of pointing with defendant’s resident engineer on September 29, 1950, and upon the latter’s instructions proceeded with the work involved, on the understanding that a written directive to perform the work would be issued by defendant.
The resident engineer addressed the following letters to plaintiff on the dates indicated:

November 10, 1950

You are directed to fill all voids in masonry joints and holes in masonry partitions enclosing the elevator shafts as this work is not acceptable in its present condition.
You are also directed to fill in the holes around electrical conduits, heating and plumbing pipes in masonry partitions in the sub-basement.

November 30,1950

You are directed to fill all voids in masonry joints and holes in masonry partitions enclosing the dumbwaiter shafts as this work is not acceptable in its present condition. .
*747 24. On December 11, 1950 plaintiff wrote to the contracting officer quoting the resident engineer’s letters (Finding 23) and stated:
In accordance with the above directives, we are proceeding with the work as directed, and will submit to you our proposal summary covering the additional cost involved.
The contracting officer responded to this letter under date of December 14, 1950, as follows:
Reference is made to your letter dated 11 December 1950, advising that you are complying with the instructions issued by the Engineer-in-Charge to fill voids, in masonry joints and holes in masonry walls enclosing the elevator and dumbwaiter shafts and that you will request additional compensation for this work.
Your attention is called to the provisions of Article 6 and 7 of the contract. It is the opinion of this office that the workmanship of the elevator and dumbwaiter shaft walls is defective and that correction of the defective work is required under the terms of the contract at no increase in contract price.
25. Plaintiff denied that its work was defective and, in a letter to the contracting officer dated January 4,1951, stated that the elevator and dumbwaiter shafts had been given the treatment customarily given to concealed spaces. Plaintiff’s letter reads as follows:
Receipt is acknowledged of your letter of December 14, 1950, regarding the filling of voids in the masonry joints and holes in masonry walls enclosing the elevator and dumbwaiter shafts.
We wish to advise that we take exception to your statement that the workmanship of the elevator and dumbwaiter shaft walls is defective for the interior of these shafts are concealed spaces in contrast to exposed spaces as described in the finish schedules and in the specifications. They have been given the treatment customarily given to such concealed spaces. Your directive to “fill voids in masonry joints” is merely another way to add to the specifications a requirement that these joints be pointed. Such a requirement is one contrary to the intent of this contract and one which we did not figure in bidding the job.
We, therefore, wish to advise that we proceeded with this work, as directed, but have done so under protest, *748 and are definitely entitled to compensation for the additional cost involved.
With respect to the “holes in masonry walls”, an inspection of this was made and the few instances in which holes were encountered, they were definitely taken care of. This, of course, will not be reflected in our proposal summary for additional cost involved, as stated above.
26. The specifications which provide for the treatment of masonry joints are in the following quoted sections:

Section 5-06h

(8) Joints. All face brick joints throughout the work shall be rodded with a round rod approximately lj4 inch in diameter, so as to provide a slightly concave joint that will seal the mortar against the upper and lower front edge of each brick at joints. The rodding of mortar joints shall not be performed until the mortar has partially set. Brickwork for any interior wall surfaces not specified to be plastered shall be cut off flush and not rodded.

Section 5-06h

Pointing and Gleaning. At completion of the work, all holes in joints of exposed masonry surfaces shall be pointed by completely filling with mortar. After pointing, all exposed masonry surfaces shall be wetted and then cleaned with a solution of 10 percent by volume of muriatic (hydrochloric) acid, applied with stiff fiber brushes leaving the masonry clean, free of mortar daubs, and with tight mortar joints throughout. Immediately after cleaning, the masonry surfaces shall be rinsed down with clear water.
27. Neither the specifications nor the contract drawings provided for a plaster finish for the walls of the elevator and dumbwaiter shafts, and in the absence of such requirements plaintiff’s construction of the walls in the elevator and dumbwaiter shafts was in accordance with the provisions of section 5-06b (3) quoted above.[1] There is no evidence that the work performed was otherwise defective.
*749 28. Plaintiff’s costs incurred for the work performed in pointing the walls of the elevator and dumbwaiter shafts as above described, including 10 percent for profit, was in the amount of $3,654.19.
On January 31, 1951, plaintiff submitted a claim to the contracting officer for the above amount.
29. Payment for plaintiff’s claimed additional costs in the several claims, hereinabove described, was denied by the contracting officer, and subsequently by the Board of Contract Appeals in a written decision which was filed on January 26,1955.
Plaintiff’s costs, under the three separate headings, which are deemed to be supported by the evidence, are found to be as follows:
Claim #1. Difference in cost of using liollow tile instead of Gypsum blocks in certain areas-$38,654.21
Claim #2. Cost of extending enclosures at column and pipe spaces to floor slab above- 3,131.59
Claim #3. Pointing of elevator and dumbwaiter shaft walls_ 3, 654.19
Total_ 45,439.99
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and it is therefore adjudged and ordered that it recover of and from the United States forty-five thousand four hundred thirty-nine dollars and ninety-nine cents ($45,439.99).

 Sheet #6 of the contract drawings contains a “Finish Schedule” which shows various types of wall finish required, each identified by a number for reference purposes, and this number is placed appropriately on the construction drawings to indicate the type of wall finish required at the indicated location.
The construction drawings for elevator and dumbwaiter shafts do not display a “finish” number and in the absence of such instruction the type of finish would appear to be at the contractor’s discretion.