**BLACK, RABER–KIEF & ASSOCIATES**

v.

**The UNITED STATES.**

**No. 10–61.**

United States Court of Claims.
Feb. 18, 1966.

------

J. Garner Anthony, Honolulu, Hawaii, for plaintiff. Arthur B. Reinwald and Robertson, Castle & Anthony, Honolulu, Hawaii, of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DAVIS, Judge.[*]

In 1958-1960, plaintiff, a joint venture, constructed a Capehart Act Housing project for the Air Force on Guam, mainly with Filipino laborers imported from the Philippine Islands. The claim is that the defendant ordered plaintiff to pay these workers higher wages than was required by the contract, and that the United States should make reimbursement for these additional wage costs. The Government replies that the plaintiff was not compelled to pay wages any greater than those it agreed to pay when it undertook the project.

The invitation for bids (issued March 31, 1958) indicated that the contractor would have to pay laborers and mechanics not less than the prevailing local wage as determined by the Secretary of Labor, and also overtime, beyond an eight-hour day, at time and one-half (see findings 13 (c–d), 14). Accompanying the invitation was a Labor Department wage decision (S–9589), dated February 25, 1958, which specified hourly rates for 56 categories, ranging from 60 cents for laborers to 68 cents for operators of heavy construction equipment. Plaintiff's bid (on May 26, 1958) agreed to pay wages not less than those contained in the prevailing wage determination of the Labor Department. On June 16, 1958, the Air Force sent plaintiff a Letter of Acceptability which obligated both parties. Miller, Inc. v. United States, 161 Ct.Cl. 455, 468, 469, cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963). The closing was scheduled for August 29, 1958, but was not in fact consummated until September 8th. Performance began late in September 1958.

Since Wage Decision S–9589 expired, by its own terms, on May 27, 1958, a new determination had to be obtained—as provided in the Letter of Acceptability. Plaintiff and the Air Force requested another finding and on July 16, 1958, the Labor Department issued Wage Decision S–25,245 (to expire October 15, 1958) which set forth the same categories and rates as in S–9589 (the February wage decision).

On September 17, 1958, after conferences and communications which indicated that plaintiff did not interpret S–9589 and S–25,245 in the same manner as the Labor Department, that agency issued a third determination, Wage Decision T–5369, in which wage rates of $1 to $1.08 replaced the former wage rates of 60 cents to 68 cents, but which made it clear that certain costs could be deducted from the payments. As already indicated, the formal contract was closed in September 1958. In performance, plaintiff followed its understanding of the September determination and paid those wages. The contract was substantially completed about the middle of July 1960, and plaintiff was paid the total price (over $20,000,000), including all changes.

[*] The court acknowledges the significant contribution of Commissioner W. Ney Evans, whose memorandum opinion has been most useful and from whom we have borrowed. We reach the same conclusion as the Commissioner.

The primary claim, as the case was tried, was that Wage Decision T–5369 (in September 1958) raised the prevailing wage rate over the earlier determinations of February and July 1958 (S–9589 and S–25,245) from 60–68 cents to $1–1.08. If one looked simply at these hourly rates, one could hardly disagree that a drastic increase had been made; one dollar per hour is indisputably more than sixty cents per hour. The problem arises because of the special system by which Filipino laborers on Guam were paid. Under the Embassy Agreement of 1947 between the United States and the Philippine Islands, governing the employment of Filipino laborers by the American military and its contractors outside of the Philippines, such Filipino personnel were to receive in kind quarters, subsistence, and hospitalization (for which they would be charged) and, also, certain free benefits (laundry, emergency medical services and dental care, and certain transportation). The whole bundle of these rights—both those for which the men would have to pay and those they would receive free—is known to this record by the surprisingly formal designation of "perquisites." There is no doubt that, in its determinations of February and July 1958, the Labor Department subjectively intended the scale of wages (60 to 68 cents per hour) to represent cash wages only; it was expected that the employer would provide perquisites in addition to the cash wages, but there was no mention of that element in the wage determinations themselves. It is likewise clear that, in its September decision which came after the problem erupted into the open in acute form, the Labor Department intended to cover, in the sums specified, both cash wages and the cost of the perquisites chargeable to the workers.

Plaintiff's original contention was that, before it bid in May 1958, it did not know, and had no reason to know, that the initial wage determination was designed to set an hourly minimum of 60–68 cents *plus* perquisites, and that the company could properly assume that

60–68 cents represented the total wage (*including* perquisites), out of which the employer could deduct the cost of lodging and subsistence. The Government argues, on the other hand, that plaintiff actually knew, or reasonably should have known, that perquisites were to be added to the 60–68 cent rate—or, at the least, that plaintiff should have inquired before making its bid.

Much of the trial before Commissioner Evans centered on this controversy. The plaintiff's witnesses testified as to its understanding and what they did to find out the prevailing wages on Guam. Defendant's witnesses, principally an Assistant Solicitor of Labor, emphasized the Labor Department's understanding. Commissioner Evans concluded, on all the evidence, that plaintiff had not borne its burden of showing that it was not on notice, before it bid, that there was a definite problem as to the place of perquisites. In the words of the trial commissioner's memorandum opinion:

"The aspect of the case which makes the decision difficult is the spread of 8,000 or 10,000 miles between the locale of the work (Guam) and the place (Washington, D. C.) where the wage determination was made. Without doubt, the Department of Labor would never have exposed an orthodox wage determination to interpretation on Guam without some qualifying explanation if the conditions existing on Guam had been known to it in greater detail. By the same token, there can be no doubt but that the plaintiff-contractor would have made inquiry in depth as to the intention of the Department of Labor if its representative (Mr. Black) had been more conversant with the history of the various labor standards statutes and of the practices of the Department of Labor in administering them.

"As the situation developed in fact, the Department of Labor, operating out of Washington in conformity with well-established practices applicable to the continental

United States, relied upon information obtained by correspondence from representatives of other Government agencies and their contractors on faraway Guam. The contractor, on the other hand, sent its representative, Mr. Black, from his home in Honolulu to Guam [late in March 1958] to gather at the source the requisite information on wages and working conditions.

\*   \*   \*   \*   \*   \*

"Mr. Black testified \* \* \* that he did not know that the 60-cent rate represented cash wages exclusive of fringe benefits; that he considered 60 cents per hour to be the rate of gross wages; and that he relied upon this conclusion (based upon his own interpretation of the official determination of prevailing wages) in the preparation and submission of plaintiff's bid. He did not testify that he knew (in the sense of being positive, or holding a conviction untroubled by doubt) that the 60-cent rate represented gross wages from which the cost of perquisites would be deductible.

"The evidence as a whole warrants the conclusion that Mr. Black left Guam with some question in his mind, however vague or inarticulate it may have been, as to whether the 60-cent rate would be subject to deduction of the cost of perquisites. Thereafter, he resolved the doubt and proceeded to prepare and submit plaintiff's bid as recounted in the findings in reliance upon the similarity he found between the Hawaiian wage rate and the Secretary's prevailing wages, assuming the latter to represent total wages.

"It was not until after his bid had been submitted that recurring doubt induced him to make specific inquiry. \* \* \*."

Plaintiff now accepts the commissioner's factual finding that it was on notice that the wage determination of February 1958 was ambiguous as to the role of perquisites, i. e. whether the contractor, in addition to the 60–68 cent per hour cash wage, was to furnish perquisites. On that finding, there is no doubt that plaintiff cannot recover on its major claim. This was a most serious ambiguity; plaintiff first asked for damages of over $1,300,000 as attributable to the alleged increase in wage rates, and only limited its claim to some $875,000 because of the statutory maximum on Capehart Act projects. The chief representative of the joint venture was aware of the ambiguity, and of its gravity, but did not seek to clarify it before bidding.[1] The Bid Invitation expressly warned the bidder to:

> "carefully examine the provisions of the form of the Housing Contract attached hereto, including the Drawings and Specifications made a part thereof; visit the site of the Housing Project; and *fully inform himself as to all conditions and matters which can in any manner affect the financing of the construction and the constructing of the housing projects or their cost.* Should the bidder find discrepancies in, or omissions from, such Drawings and Specifications or other documents attached hereto, *or should he be in doubt as to their meaning,* he should at once notify the Contracting Officer, Offutt Air Force Base, Nebraska *and obtain clarification prior to submitting a bid.* Information given will be transmitted to all known interested bidders" (emphasis added).

■ This is exactly the kind of case in which we have held that the contractor cannot "bridge the crevasse in his own favor", without suffering the consequences. *Beacon Constr. Co. v. United*

---

1. As the commissioner puts it in his finding 28(d) which we adopt: "The very confusion in relation to wage rates on Guam encountered by Mr. Black [plaintiff's representative] in the course of his investigation was enough to put him on notice to make inquiry."

States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 6–7 (1963). See, also, Ring Constr. Corp. v. United States, 162 F.Supp. 190, 192, 142 Ct.Cl. 731, 734 (1958); Jefferson Constr. Co. v. United States, 151 Ct.Cl. 75, 89–91 (1960); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 877, 163 Ct.Cl. 1, 6, 7 (1963); Blount Bros. Constr. Co. v. United States, 346 F.2d 962, 972–973, 171 Ct.Cl. —— (June 1965). The result is that plaintiff is bound by a wage determination (the February-July rulings) which impliedly provided that the total wage included perquisites and in which the specified cash sum was *not* the total wage. Contrast Tufano Constr. Corp. v. United States, Ct.Cl., 356 F.Supp. 535, also decided today.

There is a subordinate claim for the difference of 8 cents for straight time (plus overtime) between the cash wages listed in the February-July wage determinations (60–68 cents) and the cash wages actually paid by plaintiff under the September determination specifying $1.00–$1.08 per hour. As we have said, the latter decision plainly covered both cash wages and perquisites, and as to that plaintiff had no doubt. The rub is that the Government allowed plaintiff, under the Embassy Agreement, to deduct only 32 cents from the hourly wages ($1–$1.08) for perquisites charged to the laborers, and therefore required the contractor to pay 68–76 cents in cash (for straight-time). The defendant's position is that this was not an increase over the first wage determination in February because that decision, from the beginning, meant the wage to be a total of $1 (divided at that time into 60 cents in cash plus 40 cents for perquisites); to the Labor Department the important fact about the February decision (reaffirmed in July) was that the minimum wage was to be $1; perquisites were estimated to be 40 cents but, if they should turn out to be less, the full $1 would still have to be paid. It follows, in the Government's eyes, that the actual allowance for perquisites is immaterial in determining the wage; the contractor was at all times required to pay a dollar an hour; the permissible cost of perquisites (whatever that happened to be at the particular time) could be deducted, but the rest of the dollar would have to be paid in cash. Defendant seems to add that plaintiff knew this all along.

Our starting point must be the commissioner's explicit finding, with which we have no reason to disagree, that plaintiff did not actually know that the 60-cent rate (established in February) represented cash wages exclusive of perquisites, but, on the contrary, plaintiff considered 60 cents per hour to be the rate of gross wages. Finding 28(b) (c).[2] A corollary is that plaintiff did not actually know that the minimum wage set in February was $1 per hour, consisting of cash plus perquisites. We have held, however, that, regardless of its subjective understanding, plaintiff must be held, be-

---

2. Finding 28(b): "Plaintiff did not know that the 60-cent rate represented cash wages exclusive of perquisites. Wage Decision S–9589 [in February 1958] contained no indication of this fact. Neither the Air Force nor the Department of Labor advised it of the meaning intended and implied by them. The information obtained on Guam by Mr. Black was calculated more to obscure and negate the fact than to reveal it."

Finding 28(c): "Plaintiff did consider 60 cents per hour to be the rate of gross wages. Acceptance of this interpretation resulted from Mr. Black's comparison of the prevailing wage scale (60 to 68 cents per hour), read as gross wages, with comparable labor costs in Hawaii."

Defendant does not except to these findings, but nevertheless appears to urge, on the basis of information acquired by Mr. Black on Guam and of the labor costs included in plaintiff's computations preparatory to bidding, that plaintiff must have known how the Labor Department intended the wage decision to be applied. Commissioner Evans heard the testimony and weighed it carefully. We accept his conclusions. See Davis v. United States, 164 Ct.Cl. 612, 616–617 (1964); Commerce Int'l Co. v. United States, 338 F.2d 81, 86, 167 Ct.Cl. 529, 537 (1964); Litchfield Mfg. Co. v. United States, 338 F.2d 94, 98, 167 Ct.Cl. 604, 612 (1964); J. G. Watts Constr. Co. v. United States, Ct.Cl., 355 F.Supp. 573, decided Jan. 21, 1966.

cause of its failure to ask, to the obligation to pay at least 60 cents per hour plus perquisites. Is plaintiff also to be charged with notice that the February wage-decision contemplated that the perquisites would always be valued at 40 cents, despite any lesser amount which could actually be taken on their account from the workers' cash wages? We think not. As we see it, the most to which plaintiff can be held is that it was to pay 60 cents in cash plus whatever the amount at which perquisites would be valued at a particular time. In short, under the February ruling plaintiff's obligation was to pay 60 cents plus perquisites—not a total of $1.

Significantly, that determination listed only a scale of 60 to 68 cents, nothing more. There was no mention of the cost of perquisites. In arriving at the determination, the Department of Labor predicated its findings on wages paid by Hawaiian Dredging, a large Navy contractor. These wages consisted of cash wages of 60 to 68 cents plus perquisites provided at a then allowable, deductible cost of 40 cents. The reasonable cost of perquisites was, however, subject to determination in each individual case and in each case was subject to review and revision from time to time.

As we have said, bidders (actual and potential) interested in the housing project should have reached a conclusion contrary to that reached by plaintiff as to the scope of the wage determination. Specifically, they should have concluded that the scale of 60 to 68 cents represented cash wages, and that the cost of perquisites would be additional. From that point forward, they would have had to live with the facts of life in relation to the allowable cost of perquisites, and to compute their bids on the best guesses they could make as to (1) the actual cost to them of perquisites and (2) their chances of persuading the Department of Labor that such cost was reasonable and therefore fully deductible.[3] The guessing, however, would be limited to the cost of perquisites, actual and allowable. Any bidder was entitled to believe that he had a firm base from which to start—the wages payable in cash—assuming only that labor was available at such rates. There was nothing on the face of the wage-decision or the contract or the bid-invitation which should have led a bidder to inquire whether he would have to pay greater cash wages if the cost of the perquisites was reduced from the then sum of 40 cents. That may have been the undisclosed intention of the Labor Department's officials, but their latent inner view did not at all break into written words or into any external manifestation of which plaintiff should have been aware. On this point Mr. Black was *not* put on notice. He had doubts whether perquisites were additional to the cash wages, but there is no showing of a doubt, or any reason to doubt, that the only cash wages to be paid would run from 60 to 68 cents and that perquisites could vary in amount. In other words, plaintiff was not put on notice—by anything in the wage-decision, the contract documents, or the surrounding circumstances—that the minimum wage established in February was a flat $1–$1.08 per hour, rather than 60–68 cents cash plus perquisites (whatever perquisites should happen to come to).

It is irrelevant that, as defendant argues, plaintiff knew, when it made its inquiry in March 1958 into labor rates on Guam, that perquisites then amounted to 40 cents.[4] There is, as we have pointed out, no showing that plaintiff knew (or should have known) that, if that figure was later reduced to 32 cents, the employer would still have to value perquisites at the higher sum and pay the

---

3. The July wage determination was in all respects identical with that of February. Yet, between February and July, the Department of Labor reconsidered the allowable cost of perquisites deductible from wages paid by Hawaiian Dredging and revised that cost downward from 40 to 32 cents.

4. We assume this *arguendo;* the commissioner did not so find, and plaintiff disputes it.

excess to the workmen over and above the stated cash wages of 60–68 cents. Only if there was knowledge, actual or imputed, that the February determination set a total minimum wage of $1–$1.08 would it make any difference that the contractor was aware that in February–March 1958 perquisites were worth 40 cents. The commissioner's conclusory findings (findings 28(b), (c), supra, fn. 2), which we adopt, lead inevitably to the conclusion that plaintiff did not actually have that knowledge, and we have held that there was nothing to put it on notice.

■ The result must be that, since the Labor Department did not reveal its secret mind (in this respect) in the February–July determinations, the plaintiff was privileged to take those decisions at their face value. To the contractor and to the world outside the Labor Department and the Air Force, there was a change, an increase in total wages, between February and September. It is settled that, where the Government requires a contractor to pay higher wages than he was obligated to do under his contract, the United States is liable for the additional costs. Sunswick Corp. v. United States, 75 F.Supp. 221, 109 Ct.Cl. 772, cert. denied, 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755 (1948); Bateson-Stolte, Inc. v. United States, 305 F.2d 386, 389, 158 Ct.Cl. 455, 459 (1962). Moreover, plaintiff's agreement with the Government acknowledged the contractor's right to an increase in price if the initial wage determination was raised by the Labor Department.[5] No price increase was granted because the Air Force thought that the September wage decision did not result in any lifting of wage rates over the earlier determinations, of February and July. The Federal Housing Administration felt that it had no authority, though "it appears that the September 17, 1958, wage determination by the Department of Labor did result

in a wage increase", because the Air Force would not request an advancement in price. Plaintiff's redress must be in court.

The damage suffered was the increase in cost thus ordered by the Government. Defendant argues vigorously that, despite the increase, there was no injury because plaintiff made a substantial profit and because its actual labor costs were less than had been anticipated in the preparation of the bid. We agree with the trial commissioner that these facts, if such they be, are irrelevant.[6] Plaintiff was entitled to expect that, absent a price increase, it would not be ordered to pay more than the original wage decision required. That was its contractual right. Since plaintiff was directed and did have to pay such higher wages, it has been damaged. The project could have been completed for less money if these higher wages had not been prescribed. Thence the injury.

As to straight time the computation is clear. There were 2,174,150.5 such hours and the wage increase was 8 cents— from 60–68 cents to 68–76 cents (i. e. $1–$1.08, less 32 cents for perquisites). This adds up to $173,932.04.

■ In calculating the overtime increase, the commissioner multiplied the 8 cent hourly increase by time and one-half, giving 12 cents. The overtime hours are agreed to have been 619,754.5. The result is $74,370.54. Plaintiff complains of this use of 12 cents as the hourly sum for the overtime increase. The correct figure, we are told, is 60 cents. This is reached by saying that, under the original wage determination of February 1958, the overtime rate was 90 cents (1½ times 60 cents), while under the September decision that rate was $1.50 (1½ times $1). The fallacy is that plaintiff is comparing the original rate *without* the perquisites to the later rate *including* the perquisites. In the one case the over-

---

5. See paragraph 5 of the Invitation for Bids (finding 13(c)); plaintiff's wage statement in its bid (finding 15); and the Letter of Acceptability (finding 17 (c)).

6. For this reason we accept the commissioner's decision not to find these facts on which defendant relies (see finding 26(b), fn. 67), and we overruled plaintiff's exception.

time is computed on the cash wage alone, in the other on the cash wage plus the perquisites. Such different methods for calculating overtime were not required by the terms of the two determinations— and no statute, regulation, or agreement demanded this variance in treatment.[7] On the contrary, the Labor Department insisted, as plaintiff knew when it began performance, that the September determination was merely a clarification of the prior decisions, putting the same concept into different words. The method for calculating overtime should therefore have been the same under both sets of determinations. As defendant points out, an overtime differential of 12 cents is obtained whether one compares the two cash rates or the cash rates plus the perquisites.[8] It is only when the basis of the calculation is incorrectly shifted that plaintiff's overtime figure of 60 cents emerges.

Accordingly, plaintiff cannot rely on the texts or implications of the two wage decisions for the change in method of computation which is proposed. We are not certain what was the proper overtime (see footnote 8), but we are persuaded that the same method, whatever it was, was applicable to both decisions. It is unnecessary to go further, for the increase due to the Government would be no more than 12 cents in any event. Furthermore, there is neither evidence nor finding that the contractor was directed by any government official to pay overtime (after the September determination) at $1.50 per hour. To the extent that excessive overtime may have been paid, plaintiff did so voluntarily and cannot recoup from the Government. See

Kirchhof v. United States, 102 F.Supp. 770, 773–774, 121 Ct.Cl. 476, 491 (1952); Ross Eng'r Co. v. United States, 127 F. Supp. 580, 583, 130 Ct.Cl. 368, 373–374 (1955).

The wage increase attributable to the defendant was $248,302.58 ($173,932.04 straight time plus $74,370.54 overtime). Plaintiff is entitled to recover that amount and judgment is entered to that effect.

---

7. The Fair Labor Standards Act did not apply to this project, only the Embassy Agreement. If the latter called for overtime to be calculated on the basis of the total of cash wages plus perquisites, as set forth in September, it established the same requirement with respect to the February determination.

8. 1. If the February determination had remained in effect, the cash rate would have been 60 cents (to use only the basic wage) and the perquisites 32 cents—total-

ing 92 cents. If overtime is computed on this total, the rate would be $1.38 (1½ times 92 cents). Under the September determination the cash rate was 68 cents and the perquisites 32 cents (totaling $1). Basing overtime on this total, one obtains $1.50 (1½ times $1). The difference is 12 cents.

2. Using only cash wages and excluding perquisites, we reach the same figure. Overtime on 60 cents would be 90 cents; overtime on 68 cents is $1.02. Again, the difference is 12 cents.