**FRANCHI CONSTRUCTION COMPANY, Inc. and Reliance Insurance Company, Appellants,**

v.

**UNITED STATES of America ex rel. CONSOLIDATED COMSTOCK COMPANY, Inc., Appellee.**

No. 23682.

United States Court of Appeals
Fifth Circuit.

March 7, 1968.

Robert J. Sherer, Boston, Mass., Harry T. Gray, Jacksonville, Fla., for appellants.

Harlan Tuck, Orlando, Fla., for appellee.

Before TUTTLE and WISDOM, Circuit Judges, and BREWSTER, District Judge.

WISDOM, Circuit Judge:

Consolidated Comstock Company brought this action under the Miller Act against Franchi Construction Company and its surety to recover money allegedly due it for materials furnished and labor performed on a construction contract between Franchi and the United States. The district court found for Consolidated on the merits, and also awarded the use-plaintiff attorneys' fees. We affirm.

## I.

Franchi was the prime contractor for the construction of the Central Fire Station and Central Supply Facilities at the NASA Merritt Island area in Florida. Consolidated, as subcontractor, entered into a contract with Franchi July 26, 1963, to "furnish and install all items of electrical work" for certain portions of the prime contract. The parties disagree as to whether the contract required Consolidated to install certain rod supports and ceiling support angles as part of the electrical work.

The controversial provision of the subcontract was typed on a printed form used by Franchi. This provision required Consolidated to

"furnish all materials, equipment and labor, including all necessary scaffolding, and fully construct and in a good substantial, thorough and workmanlike manner perform and in every respect complete, furnish and install all items of electric work for bid items Ia Ie and #2A2C complete in strict accordance with, but not limited to, Sections #35 and 36, Book #1 and Sections #35, 36 and 37, Book #2. All of the above in strict accordance with plans and specifications for Eng (NASA) 08–176–63–4, Project #NASA 17 and addendums 1 thru 4 thereto."

Section 35 of the specifications is as follows:

"The work covered by this section of the specifications consists in furnishing all labor, equipment, supplies and materials, including pilot lamps, and in performing all operations, including cutting, channeling, chasing, necessary for the installation of complete interior wiring system, duct system, transformers, electric service connections, empty telephone raceway systems, fire alarm systems, communications and signal systems, and electric equipment, in strict accordance with this section of the specifications and the applicable drawings and subject to the terms and conditions of the contract."

Perhaps the strongest point in Consolidated's favor is that the details of installation of the support rods and ceiling support angles were not set forth in any electrical drawing. The drawings for the electrical work to be performed by Consolidated were set forth on sheet "E-2" (Electrical Floor Plan-East End) for the central supply building. The electrical fixtures to be furnished and installed by Consolidated were shown on this drawing to be attached to rod supports hanging from the ceilings. The drawing contained the notation:

"Rod supports of proper length with ceiling support angles are to be furnished *under the structural steel division.*" (Emphasis added).

S-3, covering the structural work, showed the rod supports as a part of the

work to be done by the structural contractor with a notation:

"Fixtures and channel raceway by electrical contractor."

It is only on the structural drawing that the necessary details are found. Structural drawing S-3 delineates the work by dotted lines, showing that the channel raceways are electrical work, whereas the support rods and ceiling support angles are shown by solid lines the same as all other work on the structural drawing.

It seems inconsistent with the subcontract between the parties to contend that the prime contractor would supply the materials for installation by the electrical subcontractor, when the subcontract between the parties specifically called for the electrical subcontractor "to furnish and install" electrical work in accordance with the plans and specifications. Moreover, even if such work were usually electrical work, this would not be controlling. We are dealing with a specific contract and specific plans and specifications, and not what might under other circumstances be done.

In answer, the defendants argue that the logic of having the supports furnished (in the sense of "supplied") by the Contractor is evident from the requirement: "Supports shall be constructed of materials and in a manner that will match the structural and architectural features of the building or area. * * " The best way to assure proper matching was to have both kinds of supports supplied by the same contractor. The defendants say that E-2 is consistent with other provisions in the contract which distinguish between the obligation to furnish and the obligation to install. For example, one provision requires that "All necessary supports required for the safe and proper installation of electrical equipment shall be *furnished and installed* by the Contractor" (emphasis added). Franchi wanted the steel division to furnish the rods so that they and their supports would be constructed of materials and in a manner to match the structural and architectural features of the building.

The defendants also point out, with some reason, that if, as they insist, the specification required Consolidated to *furnish and install* all necessary supports, the fact that the details for installation are shown on a structural rather than an electrical drawing "does not make them constructively invisible". And, if the drawing note is ambiguous, the ambiguity imposed upon Consolidated the duty to inquire and obtain a clarification of its responsibility. Ring Construction Corp. v. United States, 162 F.Supp. 190, 142 Ct.Cl. 731; Jefferson Construction Company v. United States, 151 Ct.Cl. 75; Beacon Construction Company of Massachusetts v. United States, 314 F.2d 501, 161 Ct.Cl. 1. The cases cited dealt with patent omissions in the specification. Here, however, the ambiguity now apparent was not apparent until construction began. Consolidated did not "take off" the ceiling support angles and rods in making its bid.

The testimony is of course conflicting. Franchi introduced evidence to show that the installation of the disputed items was usually assigned to the electricians. There is even testimony that electrical unions would object if installation jobs were given to anyone but electricians.

On the other hand, the electrical engineer who supervised the drafting of the electrical drawing testified that the language in E-2 meant "furnish and install". And three experienced electrical engineers testified that the support rods and ceiling angles were shown not to be electrical work.

An expert witness called on Franchi's behalf testified that customarily the prefix "E" refers to electrical drawings and the prefix "S" to structural drawings. He testified that the installation detailed on the drawings in this case was very unusual, and he would not commit himself to a conclusion whether it was intended that the electrical contractor or the structural contractor perform the installation. Although it is clear that he usually considered this to be electrical work, he also

720

stated that the support rods and ceiling support angles are usually detailed on electrical drawings.

In addition to arguing strongly on the facts, the defendants contend that in a host of decisions the court has construed the word "furnish" in the sense of "provide", "supply", or "deliver to". When these cases are examined, they show, as might be expected, that the meaning of "furnish" depends upon the context in which it is applied. See for example, to cite one Florida case, State ex rel. Davis v. Barber, 1939, 139 Fla. 706, 190 So. 809 in which the court said: "As to a court house 'furnish' and 'equip' have reference to vaults, safes, heating system and other essential adjuncts that are a component part of the completed structure and without which it could be useless. A court house would not be adjudged erected till these were supplied."

■ This is a close case. On the record before us, we cannot say that the trial judge was clearly erroneous in holding that the subcontractor, by its contract of July 26, 1963, did not agree to install the disputed items.

## II.

■ The defendants contend that the district court erred in awarding a judgment against the surety for attorneys' fees. In Transamerica Insurance Company v. Red Top Metal Inc., 5 Cir., 384 F.2d 752, October 18, 1967, this Court held that in a suit under the Miller Act federal law controls the interpretation of the Act and the liability of the surety on a Miller Act bond. The Court, however, looked to state law and policy to fill the interstice caused by statutory omission of a provision relating to attorneys' fees. In United States Fidelity and Guaranty Company v. Hendry Corporation, 5 Cir., 391 F.2d 13, February 29, 1968, a Miller Act suit, we looked to the law of Florida and affirmed the district court's award of attorneys' fees. In that case we suggested that the district court conduct a hearing on the reasonableness of the fees. Here the district court has made the finding "That a reasonable attorney's fee for

the services of use-plaintiff's attorney as to Counts I, III, IV, and V, is the sum of $1,600.00, and as to Count II (which went to trial) is the sum of $1,600.00, for a total of $3,200.00."

The judgment is affirmed.