**Gus KRAUS, doing business as Condor Machine Works**

v.

**The UNITED STATES.**

**No. 29–61.**

United States Court of Claims.

Oct. 14, 1966.

Walter F. Pettit, San Francisco, Cal., for plaintiff. Felix Lauricella, Allan, Miller, Groezinger, Keesling & Martin, San Francisco, Cal., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, WHITAKER, Senior Judge, and DURFEE, DAVIS and COLLINS, Judges.

## OPINION

COWEN, Chief Judge.[1]

This is a suit on a bid contract between the parties, dated June 30, 1958, designated N 228(217) 24792, pursuant to which plaintiff, conducting a tool and die business at San Francisco, California, manufactured and delivered to defendant's San Francisco Naval Shipyard 2,300 quick-coupling securing straps made in three different overall lengths itemized as CRES Assemblies Nos. 1 through 3. The total contract price was $11,425, averaging about $5 per unit. The contract documents were drawn by the defendant.

After all deliveries had been made, defendant determined that the coupling straps were too short, and demanded that plaintiff rework them to provide overall lengths in conformity with defendant's interpretation of contract requirements. Plaintiff complied, but reserved its right to claim additional costs as an equitable adjustment for a change in the contract specification ordered by defendant's contracting officer.

After delivery of the reworked straps, defendant completed payment of the original contract price, as modified in respects not now relevant. The parties are agreed that if plaintiff is entitled to recover, judgment may be entered for plaintiff in the sum of $9,500 for his additional costs incurred for reworking the straps.

Pursuant to the standard Disputes article of the contract, hereinafter quoted in the findings of fact, the dispute concerning interpretation of the contract was decided adversely to plaintiff by defend-

1. Although we have disagreed with the result he reached, the court acknowledges the assistance it has derived from the opinion and findings of fact of Commissioner Roald A. Hogenson. We have borrowed portions of his opinion and adopted most of his findings of fact.

ant's contracting officer, and, on plaintiff's appeal, by the Armed Services Board of Contract Appeals (ASBCA No. 5535). In the trial of this case, the parties, pursuant to formal stipulation, agreed that the record of proceedings before the Board—

> * * * may be received in evidence in this action before the Court of Claims, and that the same may be considered by the said Court for the purpose of determining whether the decision of the Armed Services Board of Contract Appeals, rendered September 9, 1960, is final and conclusive upon the respective parties or so arbitrary, capricious, unsupported by substantial evidence, or otherwise erroneous in law as to be deprived of such finality or conclusiveness. It is further stipulated by the respective parties that, aside from the foregoing record, which is jointly offered in evidence, no further proof will be offered or presented by or on behalf of either party hereto, each party agreeing and stipulating to the closing of its own proof upon the receipt of the foregoing record in evidence herein.

Following this language was the above-mentioned conditional agreement concerning amount of recovery, after which the parties agreed:

> The foregoing stipulations have been entered into and subscribed by the respective parties upon their mutual agreement for the submission of the case without the necessity for proof de novo before the Court on the issues of liability and without the necessity for proof by the plaintiff on the issue of damages, which issue was not reached or determined by the Armed Services Board of Contract Appeals in the decision herein referenced.

The parties offered, and the trial commissioner received in evidence joint exhibits consisting of the full record of proceedings before the Board, comprised of the transcript of the hearing and testimony of witnesses before the Board, exhibits received in evidence by the Board, and other pertinent papers and documents forming the framework of the administrative record, including among others, the written decision of the Board after submission of the briefs of the parties on the merits, and also its decision on plaintiff's motion for reconsideration. Proof was closed without any de novo evidence offered or presented in this case in this court. The facts set forth in this opinion and thereafter in the formal findings of fact are necessarily derived only from the Board's record of proceedings.

The contract provides that CRES Assembly No. 1 was to consist of "lower strap, sub-assembly '1–A', and upper strap, sub-assembly '1–B'. Dimensions to be in accordance with table on plan * * *." CRES Assemblies Nos. 2 and 3 were described in the same language, except their respective sub-assemblies were designated as 2–A and 2–B, and 3–A and 3–B. All of the coupling straps were to be made in accordance with Bidder Data Plan No. CVA 702–1062956, Revision A, hereinafter called the contract drawing.

The quick-coupling securing strap consists in part of two flat stainless steel bands. At the coupling end of each band, there are attached one or more components of a latching mechanism by which the two bands may be locked together to form one coupling strap. When performed to specified curvative requirements, this strap in locked position forms a figure roughly semicircular in shape, as shown by the "Stowage Assembly" side view of the strap on the contract drawing. By means of anchor holes perforated near the uncoupled ends, the strap is affixed to a rack on board ship to secure a military missile until the latching mechanism is disengaged for removal of the missile. Prior to the award of the contract in this case, plaintiff was advised of the intended use of the contract items by Navy personnel.

The table on the contract drawing, mentioned in the above-quoted contract description of CRES Assembly No. 1, set forth dimensions in a column headed "LG. IN INCHES," showing 9.10 for "ASSEM NO 1–A" and 6.30 for "AS-

SEM NO 1–B." The like data for CRES Assemblies Nos. 2 and 3 were set forth in the table in the same manner, except that the figures varied, due to intended differences in the lengths of the three contract items.

In addition to the previously mentioned "Stowage Assembly" view, there was also set forth on the contract drawing an "Expanded View," showing the strap extending in a flattened position with its bands locked together by the latching mechanism. Neither of the two views is drawn to scale, as they both apply to three straps of varying lengths. Both views contained general terminology designating the "lower strap" sub-assembly as "Assembly A" and the "upper strap" sub-assembly as "Assembly B," not described as Assemblies Nos. 1–A, 1–B, etc., because of general applicability of both views to the three CRES Assemblies.

Six reference lines are drawn out from various parts of this flattened view of the locked coupling strap, representing in succession the (1) lower end of the lower strap, (2) the center line of the anchor hole of the lower strap, (3) the center line of the locking pin attached to the lower strap, (4) the center line of the toggle pin attached to the upper strap, (5) the center line of the anchor hole of the upper strap, and (6) the upper end of the upper strap.

In succession between the above-described reference lines, there are five successive dimensional lines extending along the length of the "Expanded View." Each dimensional line starts and ends with an arrowhead, and the point of each arrowhead touches a reference line, so that each dimensional line extends between two successive reference lines.

In conjunction with each dimensional line, there is set forth either a longitudinal dimension, expressed in inches, or certain explanatory language, as hereinafter set forth in parentheses in this paragraph. The first dimensional line (½″) extended from the uncoupled end of the lower strap to the center line of the anchor hole of the lower strap. The

second dimensional line (L FOR ASSEM "A") extended from the center line of the anchor hole to the center line of the locking pin on the lower strap. The third dimensional line (1″ ADJUST TO ± ⅜″ MIN.) extends from the center line of the locking pin on the lower strap to the center line of the toggle pin on the upper strap. The fourth dimensional line (L FOR ASSEM "B") extends from the center line of the toggle pin to the center line of the anchor hole on the upper strap. The fifth dimensional line (½″) extends from the center line of the anchor hole on the upper strap to the uncoupled end of the upper strap.

Plaintiff's interpretation of the contract drawing was that the figures shown in the table of dimensions were the overall dimensions of the upper and lower straps. Thus, in the manufacture of the straps, plaintiff used, for CRES Assembly No. 1, 9.10 inches as the overall length of the lower strap and 6.30 inches as the overall length of the upper strap. Plaintiff made the same interpretation of the table of dimensions in determining the overall lengths of the lower and upper straps of CRES Assemblies Nos. 2 and 3. Plaintiff's interpretation allowed no specific lengths for the intermediate dimensions "L FOR ASSEM 'A'" and "L FOR ASSEM 'B'." He assumed that such dimensions would "establish" themselves by adoption of the figures in the table as the overall lengths of the upper and lower straps. This overlooked the fact that the overall lengths for the upper and lower straps were nowhere set forth in either view of the drawing. On June 24, 1958, plaintiff submitted a detailed drawing which portrayed the latch mechanism plaintiff proposed to manufacture, and with one or two minor revisions defendant approved this drawing. Although plaintiff's drawing depicted the entire strap, it did not disclose to defendant that plaintiff had interpreted the dimensional data on the contract drawing in a manner different from defendant's understanding of it.

Defendant intended, and its interpretation of the contract drawing is, that the

"LG. IN INCHES" column in the table of dimensions furnishes for each of the contract items the two intermediate dimensions not otherwise expressly specified in the dimensional data, shown on the "Expanded View" portion of the contract drawing, concerning the overall length of the coupling strap in a locked position. These two intermediate dimensions are those represented by the second dimensional line (L FOR ASSEM "A") and the fourth dimensional line (L FOR ASSEM "B"), each shown on the "Expanded View" to be a part of the length of the lower or upper band. Thus, for CRES Assembly No. 1, defendant applies the 9.10 inches designated in the above table for "ASSEM NO 1–A" to the second dimensional line (L FOR ASSEM "A") and the 6.30 inches for "ASSEM NO 1–B" to the fourth dimensional line (L FOR ASSEM "B"). Accordingly, the overall length of CRES Assembly No. 1 is the sum of the five partial dimensions, ½ inch, 9.10 inches, 1 inch adjustable ± ⅜ inch, 6.30 inches, and ½ inch, or a total of 17.4 inches adjustable ± ⅜ inches. Defendant applies the same interpretation for CRES Assemblies Nos. 2 and 3.

The ASBCA found that there was confusion in the contract contributing to plaintiff's error, but concluded that a reasonably competent fabricator should have recognized from the "Expanded View" that the critical dimensions of each of the contract items were those designated for its overall length in a locked position; that with two of such dimensions not being stated in inches but being marked by way of identification, and the figures in inches for such dimensions not being elsewhere given on the drawing, a reasonably competent fabricator would have realized that the table of dimensions supplied this information but, if there was still doubt as to where this information was to be found, proper inquiry of the Government should have been made, which plaintiff never made. The Board further held that plaintiff's interpretation was not reasonable since, unless the critical dimensions were given

in inches somewhere on the drawing, plaintiff would not have had sufficient information on the drawing as to where to position either the locking pin on the lower strap assembly on the toggle pin on the upper strap assembly.

The conclusion of the Board regarding the reasonableness of plaintiff's interpretation of the contract drawing involves a construction of the terms of the contract and is a decision on a question of law that is not final against plaintiff nor binding on the court. Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 169 Ct.Cl. 384 (1965); Tufano Contracting Corp. v. United States, 356 F.2d 535, 174 Ct.Cl. 398 (1966). For the reasons hereinafter set out, we reject the decision of the Board.

It is clear that the contract drawing was confusing and that there was an ambiguity as to whether the overall lengths of the straps to be manufactured by plaintiff were shown in the table of dimensions or in the "Expanded View" of the strap that appeared on the same drawing. Although this is a close case on the facts, we have concluded that the contract, specifications, and drawing, when considered together, were fairly susceptible to the construction placed upon them by plaintiff. In so deciding, we have followed the guidelines laid down by the court in its recent decisions in WPC Enterprises Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963) and Blount Bros. Constr. Co. v. United States, 171 Ct.Cl. 478, 346 F.2d 962 (1965). In *WPC Enterprises* the court stated:

> * * * Although the potential contractor may have some duty to inquire about a major patent discrepancy, or obvious omission, or a drastic conflict in provisions * * *, he is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation. The Government, as the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agree-

ment communicate the proper notions —as well as the main risk of a failure to carry that responsibility.

Again in *Blount Bros. Constr. Co.*, the court, in outlining the responsibility of contractors in situations like that presented here, said:

> * * * They are obligated to bring to the Government's attention major discrepancies or errors which they detect in the specifications or drawings, or else fail to do so at their peril. But they are not expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents, and they are protected if they innocently construe in their own favor an ambiguity equally susceptible to another construction, for as in Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947), the basic precept is that ambiguities in contracts drawn by the Government are construed against the drafter.

█ █ The full extent of the inadequacies of the contract drawing can be ascertained by reading the transcript of testimony before the Board. It is a record which reveals that the Government's inspection officials were able, only with difficulty, to discover how plaintiff made his mistake and to explain why he should have avoided it. In the clarifying light of hindsight, we can do the same. However, the reasonableness of plaintiff's interpretation is to be tested by the provisions of the contract, the specifications, the drawing, and other information available to plaintiff at the time the contract was performed. When the principle announced in the cases cited above is applied to the facts of this case, we feel that the ambiguity should be resolved against the Government which prepared the contract documents.

Of primary importance is the fact that the contract, in describing the articles to be furnished by plaintiff, stated: "dimensions to be in accordance with the table on plan." There was no qualifying statement that the table of dimensions was meant to show anything other than the overall length of the straps to be manufactured by plaintiff, or that the specified lengths were to be regarded only as a table of intermediate dimensions by reference to the "Expanded View" of the strap shown on the contract drawing. There is no dispute that plaintiff manufactured the straps in accordance with the table of dimensions and that the straps were inspected and approved by defendant's representatives and thereafter accepted by the Government.

█ At the hearing before the Board, defendant's Inspector of Materials at the San Francisco Naval Shipyard testified that it was the usual practice to set forth overall dimensions in a table of dimensions shown on a drawing. He also testified that where, as here, the "Expanded View" of the strap shown on the drawing contains a dimension line that is intended to refer to a table of dimensions on the same drawing, it is the customary practice to insert an arrow on the dimension line and to indicate the reference by the use of a term such as "see above table." Plaintiff has excepted to the commissioner's report for failure to make a finding on this undisputed fact and, since it is a material fact which the Board should have found, we have granted plaintiff's exception and added the finding. Since there was nothing on the "Expanded View" on the drawing to indicate that the dimension there shown was to be obtained from the table of dimensions and since defendant failed to follow the customary practice in this regard, the ambiguity in the drawing was not a major patent discrepancy or obvious omission that raised the red flag of notice and obligated plaintiff to seek clarification from the contracting officer.

As shown in finding 15, defendant had an experienced and competent field inspector who was qualified to read contract drawings. After plaintiff had received the materials from his supplier, the inspector approved the lengths of the straps as plaintiff proposed to make them. He did this by measuring them with a micrometer and then comparing

the measured lengths with the lengths shown in the table of dimensions on the contract drawing. He expressly agreed with plaintiff's interpretation that the table of dimensions specified the overall lengths of the straps. If we indulge the presumption that he was performing his duty as a qualified Government inspector, we should not assume that he was careless. Certainly, one of his important duties was to make certain that the lengths of the straps conformed to the contract requirements. If plaintiff's error was so glaringly obvious or patent that he should have discovered it or made inquiry of the contracting officer, we find it difficult to understand why such a well-qualified representative of the defendant made the same mistake. Even if the inspector had no authority to supply a binding interpretation of the contract, his actions constitute highly persuasive evidence of the reasonableness of plaintiff's interpretation.

The record discloses no evidence that plaintiff realized that there was an ambiguity between the table of dimensions and the "Expanded View" on the contract drawing. It is true that he submitted straps of the length he thought the contract required to the defendant's inspector for the latter's approval, but there is no showing that this was done to clear up any confusion in plaintiff's mind. Moreover, there is no evidence to show that he stood to gain anything of consequence from his interpretation of the contract drawing.

There were others than plaintiff and the field inspector who did not find defendant's interpretation of the contract drawing to be so clear and obvious. Defendant's supervisor of inspections at the San Francisco Naval Shipyard was handed the contract drawing during the cross-examination of his testimony before the Board. When asked to state the required overall length of the straps, he referred to the table of dimensions on the drawing and read the lengths there stated. However, with the guidance of Government counsel on redirect examination, he agreed with defendant's interpretation of the contract drawing as explained in the "Expanded View." The ASBCA itself recognized that plaintiff's confusion was shared not only by the Government's field inspector but "also to some degree by Government supervisory inspection personnel who had some initial difficulty in determining just where Appellant had made his error and in themselves computing what the total overall critical dimension (in a locked position) would be in inches. * * *" To be sure, these additional facts are not determinative of the issue. When considered in conjunction with the other pertinent facts, however, they lend additional support to plaintiff's position.

In urging that the decision of the ASBCA should be upheld, the defendant relies upon the decisions of this court in Consolidated Eng'r Co. for use of Fulton Nat. Bank of Atlanta v. United States, 98 Ct.Cl. 256 (1943); Ring Const. Corp. v. United States 162 F.Supp. 190 142 Ct.Cl. 731 (1958), and Jefferson Constr. Co. v. United States, 151 Ct.Cl. 75 (1960). In our opinion, however, the facts in the case at bar are so decisively dissimilar that the three decisions do not support defendant's position.

In Consolidated Eng'r etc. Co. v. United States, the specifications contained a direct inconsistency that was so patent as to evoke an inquiry by any prospective bidder. The contractor was fully aware of the ambiguity and, instead of asking for a clarification, protected itself by an agreement with the subcontractor that the latter would do whatever work the defendant intended by the specifications. When the contractor filed a claim for the extra work, the court held that, since he was aware of the ambiguity, he could not accept the contract and then claim that the ambiguity should be resolved in its favor.

In Ring Constr. Corp. v. United States, there was a question as to whether the specifications required plaintiff to carry furring covering certain steel columns to the floor slab above or to stop the furring 4 inches below the suspended ceiling level. It was a well-established

custom of the trade and a matter of common knowledge in the construction industry that the stel columns should be covered throughout their entire length to prevent buckling under direct exposure to flames in case of fire. "With some hesitation," the court concluded that the contractor was obligated to call such an obvious omission to the attention of the contracting officer and to make certain that the omission was deliberate if the contractor intended to take advantage of it.

In Jefferson Constr. Co. v. United States, the court found that the language of the specification was so clear and unambiguous that the interpretation urged by the contractor was not reasonably possible. It also concluded that the unusual profit, which would have resulted from the adoption. of the contractor's view, was inconsistent with his claim that there was no intention to perform the work in question. In addition and as an independent ground for denying recovery, the court found that, before his bid was submitted, the contractor was fully cognizant that there was a question as to the meaning of the specifications but made no effort to obtain a clarification. In the face of a contractual requirement that any explanation desired as to the interpretation of the specifications should be submitted in writing in time to permit a reply before bids were submitted, the court held that the contractor's failure to seek an authoritative determination precluded his recovery.

For the reasons stated above, plaintiff is entitled to recover the sum of $9,500, the stipulated amount of the extra costs he incurred in reworking the straps. Judgment is entered to that effect.

DURFEE, Judge (dissenting):

We respectfully dissent from the majority opinion in favor of plaintiff in this case. As stated in the majority opinion, the ASBCA found that there was confusion in the contract contributing to plaintiff's error, but concluded that a reasonably competent fabricator should have recognized from the "Expanded View" that the critical dimensions of each of the contract items were those designated for its overall length in a locked position; that with two of such dimensions not being stated in inches but being marked by way of identification, and the figures in inches for such dimensions not being elsewhere given on the drawing, a reasonably competent fabricator would have realized that the table of dimensions supplied this information but, if there was still doubt as to where this information was to be found, proper inquiry of the Government should have been made, which plaintiff never made. The Board further held that plaintiff's interpretation was not reasonable since, unless the critical dimensions were given in inches somewhere on the drawing, plaintiff would not have had sufficient information on the drawing as to where to position either the locking pin on the lower strap assembly or the toggle pin on the upper strap assembly.

We agree with the majority that this conclusion by the Board regarding the reasonableness of plaintiff's interpretation of the contract is a decision on a question of law, and is not final against plaintiff nor binding on the court. We disagree that the reasons set out by the majority opinion constitute sufficient basis for rejecting the Board's decision.

The trial commissioner concluded, and we think correctly, that the plain existence in this case of overall dimensional lines alongside the "Expanded View" on the contract drawing, raises a *patent* or *obvious* question as to whether the figures for the intermediate distances "L FOR ASSEM 'A' " and "L FOR ASSEM 'B' " were those supplied in the "LG. IN INCHES" column of the table of dimensions, or since no figures were otherwise supplied for such intermediate dimensions, whether there had been an omission of such figures from the contract drawing and specifications.

The majority opinion conceded that the contract drawing was confusing, and

that there was an ambiguity as to whether the overall lengths of the straps to be manufactured by plaintiff were shown in the table of dimensions or in the "Expanded View" of the strap that appeared on the same drawing and that "this is a close case on the facts." We do not agree, however, with the conclusion reached by the majority that the contract specifications and drawing, when considered together, were fairly susceptible of the construction placed upon them by plaintiff.

Obviously, plaintiff made a mistake in the original manufacture of the straps, due largely to his complete failure to even consider the dimensional line "L FOR ASSEMBLY A" supplied by the "Expanded View" in the drawings. If he had done this, the discrepancy in overall dimensions between the "Expanded View" and the table of dimensions would have been apparent. This failure by plaintiff to even notice the ambiguity is perhaps best explained by his lack of knowledge or expertise in examining the drawing and specifications. Upon notice of rejection of the straps by the Government, he for the first time went to see the Contracting Officer when, as he testified, "Of course, I got a bawling out right then, I didn't follow the plan right. I don't know how to read a blueprint." (Transcript p. 48).

The majority opinion stresses the fact that the field inspector agreed with plaintiff's interpretation that the table of dimensions specified the overall length of the straps. Apparently, there was some question in plaintiff's mind, since he testified that he discussed the *overall length* with the inspector before and after he ordered the straps. His order for the straps was made solely by reference to the table of separate dimensions and "Mr. Condon established that is the length of the strap." (Transcript p. 134). The plain existence on the contract drawing of the overall dimension lines alongside the "Expanded View" raised a patent or obvious question as to whether the figures for the intermedi-

ate distances "L FOR ASSEM 'A'" and "L FOR ASSEM 'B'" were those supplied in the "LG. IN INCHES" column of the table of dimensions, or whether there had been an omission of the figures for intermediate dimensions from the contract drawing and specification. See Consolidated Engineering Co., etc. v. United States, 98 Ct.Cl. 256, 280 (1943); Ring Construction Corp. v. United States, 162 F.Supp. 190, 192, 142 Ct.Cl. 731, 734 (1958); Jefferson Construction Co. v. United States, 151 Ct.Cl. 75, 89–91 (1960).

All that plaintiff had to say about the "Expanded View" with its dimensional line "L for Assembly A", etc., was that he did not definitely know what it meant, and no one ever told him what it meant. (Transcript p. 70). There is no evidence that Inspector Condon ever turned his attention to this aspect of the "Expanded View" in the contract drawing. This perhaps explains why plaintiff never understood the drawing. The discrepancy between the overall dimensions required by the "Expanded View" drawing and the table of dimensions was there; it was patent; and it was completely overlooked until the job was done, and the error discovered.

Since plaintiff did not understand the drawing, perhaps because he didn't know how to read a blueprint, he had a duty to inquire what it meant. This duty was in no way met by a discussion with the inspector in which an essential part of the contract drawing was completely overlooked.

Plaintiff, therefore, was required to contact the Contracting Officer, the administrator of the contract, and seek a clarification. But such a procedure was not followed. The only representative of defendant to whom plaintiff conveyed his understanding (or lack of understanding) of the dimensional requirements during the process of manufacture was the field inspector. No evidence was presented that the field inspector in this instance had any authority to clarify patent ambiguities, or that he even

attempted such clarification.[1] On the contrary, this authority rested solely with the Contracting Officer under the express terms of the contract. Plaintiff's failure to contact the Contracting Officer for a clarification should relieve defendant of any liability for the correction of plaintiff's error, and plaintiff should be precluded from recovery in this case.

DAVIS, Judge, joins in the foregoing dissenting opinion.

---

1. Section 5 of the contract is entitled "Inspection." Subsection (d) thereof provides:

"(d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to acceptance. Except as otherwise provided in this contract, acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud."