**MAX DRILL, INC.**
v.
**The UNITED STATES.**
No. 102–68.

United States Court of Claims.
June 12, 1970.

Jerome Reiss, New York City, for plaintiff; Max E. Greenberg, New York City, attorney of record. Max E. Greenberg, Trayman, Harris, Cantor, Reiss & Blasky, New York City, of counsel.

Katherine H. Johnson, Alexandria, Va., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner Franklin M. Stone with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on December 30, 1969, wherein such facts as are necessary to the opinion are set forth. Defendant filed a request for review by the court of the commissioner's report and recommended conclusion and urged that the petition be dismissed. Plaintiff urged that the court adopt the commissioner's report in its entirety. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is granted, defendant's cross-motion is denied and judgment is entered for plaintiff with further proceedings in this court stayed pursuant to Rule 167 for 90 days to afford the parties an opportunity to obtain an administrative resolution of the amount of the equitable adjustment to which plaintiff is entitled.

OPINION OF COMMISSIONER

STONE, Commissioner:

This is a contract case which is before the court on plaintiff's motion and defendant's cross-motion for summary judgment. It calls for a review, in accordance with the standards prescribed by the Wunderlich Act,[1] of a decision rendered by the Armed Services Board of Contract Appeals (ASBCA),[2] denying plaintiff's claim for additional compensation covering certain work performed under Contract No. AF (600)–3141, dated May 19, 1965, between plaintiff and defendant, acting through the United States Air Force, for the repair, renovation and painting of five[3] dormitory buildings at Loring Air Force Base (AFB), Limestone, Maine.

The Invitation For Bids, together with Instructions to Bidders, was issued on April 9, 1965, and amended on April 28, 1965. Plaintiff's bid of $167,590 for the entire job was accepted and the contract awarded to it on May 19, 1965. The next two low bids were $169,445 and $179,577, and five of the seven bids submitted were under $200,000. The Government's estimate of the work to be performed under the contract was $199,100. The contract was actually signed for plaintiff on May 25, 1965, and approved and signed on behalf of the Government by Dorothy J. Allen, the contracting officer, on May 28, 1965. Change orders were issued, which increased the total contract price to an amount "Not to Exceed $199,589.75,"[4] and July 30, 1966, was the date finally fixed for completion of all the work required by the contract, including the exterior painting.

1. 41 U.S.C. §§ 321–322 (1964).

2. ASBCA No. 11841, dated January 22, 1968, 68–1 BCA ¶ 6823.

3. The opinion of the ASBCA in question says that the contract related to four buildings, but a footnote on page 1 of said opinion states: "This number [4] is uncertain on this record. There is testimony that the number is five." Although the basic contract refers to four buildings, a supplementary contract document entitled "Statement of Work," Sheet 8 of the contract drawings, Specification SW–2a, 18, the briefs of both parties, and all of the testimony on this issue refer to five dormitory buildings; therefore the latter number is used in the instant opinion.

4. The increase in the contract price did not in any way relate to the disputed work involved here.

The contract contained, among other provisions, the standard "disputes" and "changes" clauses customarily included in Government construction contracts.

The painting specifications, which are the keystone of the instant litigation, contained, *inter alia,* the following provisions:

SW–2 PRINCIPLE [sic] FEATURES: The principal features of the work are as follows:

 a. *Work in all dormitory buildings:*

 \* \* \* \* \* \* \* \* \* \*

 18. Paint all exterior painted surfaces on all 5 dormitory buildings. Work to include all doors and windows, frames and trim, soffits, including flashing, ladders, fire escapes and railings.

 \* \* \* \* \* \* \* \* \* \*

TP 10–06 AREA AND SURFACE PREPARATION:

 a. *Cleaning and preparation of surface:* The Contractor will not begin surface painting until the surface has been conditioned and inspected by the Contracting Officer's representative. Unless specified otherwise, hardware, hardware accessories, plates, lighting fixtures, and similar items not previously painted, will be removed before surface preparation and painting operations, or will be otherwise protected. Following completion of each building, removed items will be reinstalled. Removal and reinstallation of building items will be done by workmen skilled in the trades involved. Surfaces to be painted will be clean before applying paint. \* \* \* Cleaning and painting will be so programmed that dust and other contaminants will not fall on wet, newly painted surfaces. \* \* \* The workmen must protect all painting. Protective coverings must be removed immediately after space is painted and at the end of each day, if the space is not completed. Storm windows and window screens will be removed, protected and reinstalled after painting is completed and paint is dry. Areas not to be painted will be protected by masking tape or other approved method. \* \* \*

 \* \* \* \* \* \* \* \* \* \*

TP 10–08 SURFACES TO BE PAINTED:

 a. *General:* Except as specified under SURFACES NOT TO BE PAINTED, the surfaces listed in the painting scheduled below shall receive the surface preparation, paints, and number of coats prescribed. \* \* \*

 \* \* \* \* \* \* \* \* \* \*

 b. *Painting schedule:*

(1) INTERIOR

| Surface | Surface Preparation and pretreatment | 1st coat | 2nd coat | 3rd coat |
|---|---|---|---|---|
| \* \* \* \* | | \* \* | \* \* | \* \* |
| Wood and Metal Interior trim | \* \* \* | TT–P–636b | TT–E–543 | TT–E–508 |
| \* \* \* \* | | \* \* | \* \* | \* \* |

## (2) EXTERIOR

| Surface | Surface Preparation and pretreatment | 1st coat | 2nd coat | 3rd coat |
|---|---|---|---|---|
| * * | * * | * * | * * | * * |
| Wood trim and surfaces | * * * | TT–P–25a | TT–P–102a | TT–P–102a |
| * * | * * | * * | * * | * * |

———◆———

Plaintiff did not paint certain wood sashes beneath the aluminum storm windows on the dormitory buildings designated in the contract until after being ordered to do so by a new contracting officer who replaced the original one. Plaintiff, contending that the contract specifications did not require the painting of the wood sashes in question, performed the work as directed under protest and thereafter claimed additional compensation which the contracting officer denied. On appeal, the ASBCA (hereinafter sometimes referred to as "the Board") sustained the action of the contracting officer and this suit followed.

 Basically, the instant case turns on a question of interpretation of the contract. This court may interpret the contract without regard to any prior administrative decision. "Under the express language of * * * the Wunderlich Act, 41 U.S.C. §§ 321–22, the Board is entitled to finality only as to questions of fact. * * * It has been consistently held by this court that the interpretation of the language of a contract is a question of law, not a question of fact, and thus prior administrative determination on such a question is not final or binding on the court." Dynamics Corp. of America v. United States, 389 F.2d 424, 429, 182 Ct.Cl. 62, 71–72 (1968); Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 974, 169 Ct.Cl. 384, 386 (1965); Copco Steel & Eng'r Co. v. United States, 341 F.2d 590, 595, 169 Ct.Cl. 601, 610 (1965).

After reviewing the pleadings, administrative record, and briefs respectively submitted by the parties, it is concluded that the Board's decision was erroneous, and that plaintiff is entitled to recover in the present action.

Preliminary to outlining and discussing other pertinent facts, it will contribute to a better understanding of this case to note that the Board found, 68–1 BCA at pp. 31,536, and the evidence substantially confirms, as follows:

There are two types of storm windows involved in this controversy, each covering conventional type, previously painted, wood-sash windows. One provided in its frame three tracks to accommodate two storm and one screen removable inserts. The other consisted of a single glass panel held within a metal frame by a number of small cams and easily removable by turning screws * * *. The frames themselves, of the storm windows, were screwed to the wooden window frames * * * and were not readily removable * * *. The removal of the storm sashes made the windows accessible.

In connection with the above, it should be further explained that the record shows that the original wood sash in question was directly below the storm windows; however, wood trim surrounded the aluminum storm windows on the exterior of the buildings. It also is noted that undisputed testimony presented to the Board by Mr. Edward Funkhouser,

plaintiff's Chief Estimator and Project Engineer, supports plaintiff's contention that while some of the frames were removable by breaking the caulking seal and unscrewing, others were permanently affixed.

According to Mr. Funkhouser, the five dormitory buildings contained 2106 pairs of windows, 484 single windows, a number of 32-foot high windows covering interior stairwells, plus basement windows. The large vertical windows are not the subject of controversy. The basement windows were not covered with storm windows, although some were protected with wire security devices. After these devices had been removed by Government personnel, the wooden sashes of the basement windows were painted by plaintiff.

It should be noted that specific reference to wood sashes of any sort was not made in the contract. There was no written requirement that *interior* wood sashes be painted, and this kind of work was performed only after a modification "swapping" a contract requirement for the painting of ceilings was issued by the contracting officer.

Early in May 1965, prior to the deadline for submitting bids on the contract, Mr. Funkhouser visited Loring AFB for the purpose of preparing a final estimate as a basis for preparing plaintiff's bid. He was directed at the Main Gate to the Base Procurement Office where he was in turn directed by an unknown party to the Base Engineer's Office. At the latter stop, he requested that a person representing the contracting officer be assigned to accompany him to the job sites and answer questions pertaining to the contract.

Lieutenant Noel Paynic, an engineer in the Base Engineer's Office who had been designated as the Technical Representative of the contracting officer,[5] was assigned to take Mr. Funkhouser to view the barracks involved. Lt. Paynic had designed the project, prepared the bidding documents for it, and his name appeared on the drawings. According to the contracting officer, Lt. Paynic was authorized to make minor field changes in the contract. He knew what the contract required and was normally, unless absent, the only one designated to answer any questions that might arise prior to award of the contract. Lt. Paynic did not tell Mr. Funkhouser that he was (or was not) an authorized representative of the contracting officer, but the fact that Lt. Paynic had designed and prepared the job was communicated to plaintiff's estimator during their discussion.

Lt. Paynic and Mr. Funkhouser examined the buildings identified in the contract. Undisputed testimony was presented to the Board to the effect that in the course of making a "quantity survey" on the bases of the contract specifications and drawings, prior to conducting its pre-bid inspection of the buildings, plaintiff had interpreted the contract specifications as excluding the painting of the wood sashes that were part of the dormitories' original exterior windows but which had been covered by the aluminum storm windows. For the purpose of confirming this interpretation, Mr. Funkhouser asked Lt. Paynic whether the wood sash required painting under the contract. In response to this question, Lt. Paynic advised that the painting of said wood sash was not a contract requirement, saying, in the words of the Board, "that it was not the Government's intention to paint the wood sash behind or in back of the storm windows."

The Instructions to Bidders mentioned earlier contained, *inter alia,* the following provision:

1. *Explanations to Bidders.* Any explanation desired by a bidder regarding the meaning or interpretation of the invitation for bids, drawings, specifications, etc., must be requested in writing and with sufficient time allowed for a reply to reach bidders before the submission of their bids. Any interpretation made will be in the form

---

5. See SP-1-21 Designation of Technical Representative, *supra,* included in the Special Provisions of the contract.

of an amendment of the invitation for bids, drawings, specifications, etc., and will be furnished to all prospective bidders. Its receipt by the bidder must be acknowledged in the space provided on the Bid Form (Standard Form 21) or by letter or telegram received before the time set for opening of bids. Oral explanations or instructions given before the award of the contract will not be binding.

Plaintiff is not alleged to have requested clarification in writing with respect to the painting of the wood sashes and no amendment regarding the same was ever issued by defendant. It is clear from the record that Lt. Paynic and Mr. Funkhouser were in such complete accord that the contract did not contemplate the painting of the wood sashes in dispute that plaintiff concluded there was no necessity for making a written request for clarification of the contract requirements relating to exterior painting work.

As indicated hereinbefore, subsequent to the time of the discussion between Lt. Paynic and Mr. Funkhouser, plaintiff submitted its bid, was awarded the contract, and started work after receiving notice to proceed.

Painting constituted 12 percent of the total work on the renovation contract. By December 13, 1965, 65 percent of the total interior/exterior painting had been completed. Four of the five dormitory buildings had received two of the three coats of paint required by the specifications. The fifth building had received no exterior paint at all. The wood sash trim surrounding the aluminum storm windows, which plaintiff had planned to paint, had in fact been painted. However, the wood sash beneath the aluminum frames had not received any paint.

During the period starting sometime in June 1965, when work under the contract first commenced, and ending in the middle of December 1965, Keith Crossman, plaintiff's Job Superintendent at Loring AFB, conferred regularly with defendant's job inspector and the contracting officer regarding weekly and monthly progress, so that payments based on the percentage of job completion could be obtained. Although various contract items were discussed, the question of the need to paint the wood sash never arose. Lt. Paynic left the Base permanently on March 7, 1966. During the period from the commencement of work under the contract until after the departure of Lt. Paynic, plaintiff was never requested to paint the wood sashes, and payments were made without any question or complaint by the Government.

After Lt. Paynic's departure from Loring AFB, Mr. Alberic Cyr, the head of project preparation and previously Paynic's superior, became the designated Technical Representative for the contract in this case. Lt. Paynic had never mentioned his discussions with Mr. Funkhouser or any other bidder to Cyr, and the latter did not know whether such discussions took place at all. In any event, on about March 23, 1966, Mr. Cyr inspected the five dormitory buildings under this contract, and ascertained that plaintiff had not removed the storm windows and painted the wood sashes involved here. At some time previous to this contract these sashes had been painted. Mr. Cyr testified before the Board that he did not discuss his findings with the contracting officer, and did not know whether the later decision that the wood sashes were part of the contract was a result of his recommendations. Correspondence he claimed to have written on the subject was not introduced in evidence at the Board hearing.

The record discloses that a letter dated April 6, 1966, was sent to plaintiff by the contracting officer in which she stated, in pertinent part, "[p]ainting of exterior windows called for by Contract Specifications TP10–06a titled 'Cleaning and Preparation of Surfaces' and TP10–08b(2) 'Painting Schedule, Exterior' has not been completed." Thereafter, she sent to plaintiff another letter, dated April 22, 1966, which reads in part: "[r]equest this office be advised as soon as practicable of your plans for correction of deficiencies and proposed price

for changes in the work previously scheduled to resume 15 May 1966 * * *."

Plaintiff sent an ambiguous reponse to the contracting officer on May 12, 1966, which does not indicate whether or not it was aware that defendant wanted the wood sashes painted. In the interim between the sending of the above-mentioned April 6 and May 12 letters, Dorothy J. Allen, on May 1, 1966, had her warrant as contracting officer on the instant contract revoked, and she was replaced in that capacity by a Mr. B. L. Singer. Plaintiff notes in its brief in opposition to defendant's cross-motion for summary judgment that neither of the contract provisions referred to in the April 6 letter mention "exterior windows" specifically, and that neither letter refers to the wood sashes by name.

Thus, it appears that the first clear statement of the Government's interpretation of the contract requirements occurred on May 26, 1966, during a conversation between the new contracting officer and Mr. Funkhouser. An exchange of letters between Mr. Singer and plaintiff followed, including one dated May 27, 1966, in which plaintiff contended that Lt. Paynic had indicated to the previous contracting officer's office that the wood sashes were not part of the contract. Finally, in a letter and a telegram dated July 12 and July 13, 1966, respectively, the contracting officer specifically ordered plaintiff to paint the wood sashes. This was eventually done and became the subject of this claim.

■ The Board seems to have accepted the principle espoused by this court that when there is a contract that has been written by the Government which is ambiguous, the ambiguity will be resolved against the drafter of the document and in favor of the other party, if that party's interpretation can be reasonably sustained by the contract. Sun Shipbuilding & Dry Dock Co. v. United States, 393 F.2d 807, 816, 183 Ct.Cl. 358, 372 (1968); Bennett v. United States, 371 F.2d 859, 861, 178 Ct.Cl. 61, 64 (1967);

Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947). However, the Board concluded 68–1 BCA, at p. 31,536 that there was no ambiguity in the contract "which would require us to resolve the issue in the contractor's favor," stating "we are of the opinion that the only reasonable interpretation of the contract and specifications required the painting in issue."

■■ Let us turn now to the question of whether the plaintiff's interpretation of the contract in the instant case is a reasonable one. The interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed by the courts to be of great, if not controlling weight. General Warehouse Two v. United States, 389 F.2d 1016, 1020, 181 Ct.Cl. 180, 187 (1967); Houston Ready-Cut House Co. v. United States, 96 F.Supp. 629, 635, 119 Ct.Cl. 120, 187–188 (1951). It is a canon of contract construction that the interpretation placed by the parties upon a contract during its performance is demonstrative of their intention. Jansen v. United States, 344 F.2d 363, 369, 170 Ct.Cl. 346, 354–355 (1965).

The Board found and stated in its opinion that the Technical Representative, i. e., Lt. Paynic, who had designed the specifications told plaintiff that the wood sashes were not part of the contract. It also found that a controversy over this work did not arise until approximately 1 year after the contract was signed. No testimony was offered at the Board hearing to the effect that any Government official, at the time of contracting, deemed the wood sashes to be part of the contract. No testimony was presented by defendant to the effect that during the first year of operations, plaintiff was told that its progress was not satisfactory or that it had neglected to do contract work. Yet, the Board finds no ambiguity on this point, disregarding evidence of the interpretation placed on the contract by the parties thereto for a substantial portion of its life.

Plaintiff, in support of its position that the contract specifications did not require the painting of the wood sashes in dispute, claims that the cost of such work was not included in the estimate on which plaintiff's bid was based. As to this claim, the Board stated 68–1 BCA at p. 31,536:

* * * We decline, however, to make this finding, because the *documentary* evidence submitted in support of that position is *inconclusive.* * * [Emphasis added.]

At first blush, it would appear to be unnecessary to examine the question of whether or not plaintiff figured the cost of painting the wood sashes in its bid, since the case was before the Board solely on the issue of liability. However, in the facts and circumstances present here, this question raises an important and factual issue to which the Board failed to give adequate attention.

■ Since the Board's decision that there was no ambiguity in the contract might have been altered had it found that plaintiff did not include the cost of painting the sashes in its bid, it is necessary to determine whether the failure to make such finding was in error. Where an administrative board had failed to make a relevant finding of fact as to which the evidence was undisputed, this court has made such a finding rather than referring the matter back to the Board to do so. Maxwell Dynamometer Co. v. United States, 181 Ct.Cl. 607, 631, 386 F.2d 855, 870 (1967).

Mr. Funkhouser testified that he did not remember whether or not he knew that there were storm windows on the buildings when he arrived at the jobsite for his pre-bid investigation. The specifications, of course, take note of this fact, and the estimator had examined them in order to make what he termed a "quantity survey." Although his testimony lacks clarity on this point, Mr. Funkhouser seems to have counted the total number of windows on the plans,

but had not figured a price based on this number. His use of the word "quantity," in referring to the pre-bid survey he made before viewing the dormitory buildings preliminary to plaintiff's bid submission, is not within the context of number of feet of wood to be painted but rather only in terms of the number of windows contained in the five buildings. To illustrate, in response to the question: "How about quantity?", Mr. Funkhouser answered: "My number of windows remained the same. These are openings. Openings in a building would remain the same."

Mr. Funkhouser further testified that he figured the estimated material cost after returning from the jobsite investigation. This estimate included the painting of the sash trim around the several windows but not the wood sash itself. Mr. Funkhouser claimed that he would have had to roughly double his estimate had he been required to paint the sashes.

Plaintiff's general estimate sheet number 4, dated April 30, 1965, includes cost and quantity figures for painting sash trim but makes no mention of painting wood sash. Since Mr. Funkhouser is alleged to have conferred with Lt. Paynic shortly after that date, there is a question as to exactly *when* plaintiff's bid was priced out. However, using either date, the estimate sheet suggests that plaintiff did not include the cost of painting sash in its bid.

Finally, plaintiff introduced a letter written to its painting subcontractor on June 21, 1965, stating that "wood sash themselves behind the aluminum windows do not get painted * * *." This letter allegedly confirmed an earlier conversation at the jobsite, and was written prior to any dispute with the Government.

It is granted that the "documentary" evidence as to whether plaintiff included the disputed painting work might well be regarded as "inconclusive." However, considering the fact that no evidence was

introduced by defendant or appears in the record reasonably showing that plaintiff *had* figured the cost of the disputed painting work in its bid and that the Board did not specifically reject Mr. Funkhouser's unrebutted testimony on the grounds of credibility, it is difficult to understand why the Board ignored such testimony, limited its consideration of this matter solely to the "documentary evidence," and declined to find that this item had *not* been included.

The Board seems to have worked from the assumption that since plaintiff's bid was similar to four of the six other bids, all of the bidders, including plaintiff, figured the questioned item in their respective bids. None of the competing bidders was called to testify on that point, and such an unsupported assumption did not provide a strong enough reed upon which the Board could reasonably rest its failure to find that plaintiff did not figure the disputed painting work in its bid. If any conclusion can be drawn from the pattern of bids, it would seem to be that the competing contractors had similarly excluded the item in question. It is reasonable to assume that Lt. Paynic, who was not called by the Government to testify before the Board although his presence at the hearing would have simplified this and most of the other issues in the case, told *all* prospective bidders that the wood sashes were not to be painted.

Considering all of the evidence in the administrative record as a whole, it is concluded and found that plaintiff did not include the cost of painting the wood sashes in its bid, for the evidence points in only one direction and the Board, as a matter of law, could have made only one finding. Maxwell Dynamometer Co. v. United States, *supra,* at p. 631, 386 F.2d at 870. Putting aside for the moment the question of whether plaintiff's decision was justified, it seems clear that its position at the time it entered into this contract was that the item was not a requirement thereof.

The Board's opinion emphasizes that the oral instructions of Lt. Paynic could not bind the Government. It cites Watson-Warren Constr. Co., ASBCA No. 10579, 65–1 BCA ¶ 4867, at p. 23,026, as setting the principle that "[i]n the light of the Instructions to Bidders, whatever was said in these conversations cannot be treated as representations binding on the Government." The Board's opinion adds that *Watson-Warren, supra,* is especially pertinent when the statements of the Government official are "calculated not to interpret or explain, but * * to change." *Watson-Warren,* although of little value as precedent in this court in any event, involved a fact pattern significantly different from that in the instant case.

The claimant in *Watson-Warren* alleged that it had been advised by a representative of the architect-engineer, when calling, prior to bid, at an Area Engineer's Office, that its contract interpretation was correct. The claimant there also maintained that its subcontractor had obtained a similar oral interpretation from the architect himself, and added that another bidder had interpreted the bidding documents in the same manner. Unlike the instant case, in which the Board found that the Technical Representative/Contract Designer had in fact bolstered and agreed with plaintiff's view of the contract, the Board in *Watson-Warren* found that there was insufficient authentication of any such conversations. The two sentences directly prior to those cited by the Board on page 5 of its opinion now under review here are extremely revealing. In *Watson-Warren* the Board said, 65–1 BCA at p. 23,026:

In resolving these conflicting views we attach little importance to the semi-anonymous conversations of appellant's president and others as to the meaning of the specifications. They are insufficiently authenticated as to what was said and by whom, and they do not involve statements of the

contracting officer or his duly authorized representative. * * *

The Board then proceeded to show that the areas which the claimant contended were not part of the contract specifications had been clearly marked in the drawings, although they had not been mentioned in a work schedule. In the instant case, it is clear what was said, and by whom, to plaintiff regarding the wood sash. Furthermore, the work in question is nowhere specifically mentioned in the contract.

■ There is merit, as a general proposition, to defendant's contention that the Government will not be bound by unauthorized interpretations of its ordinary employees. It has long been held that a subordinate Government employee cannot render contract interpretation binding on the parties. Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 350–351 (1966). A person negotiating with an officer or agent of the Government must inform himself regarding the authority of such individual, since an officer of the Government cannot bind the Government with respect to matters beyond the limit of his authority. Wilber Nat'l Bank v. United States, 294 U.S. 120, 123–124, 55 S.Ct. 362, 79 L.Ed. 798 (1935); Miami Metropolitan Bldg. Corp. v. United States, 180 Ct.Cl. 503, 514 (1967).

■■ But it is not necessary to believe that Lt. Paynic had the authority to render binding contract interpretations in order to find for plaintiff here. Nor is it suggested that Lt. Paynic had the authority to issue major change orders in the contract, for no change was made by him. Indeed, the only change made in this case was that initiated by the Government's unilateral reversal of the contractor's (and Paynic's) interpretation of the contract and specifications. However, it would be inane to believe that he was at the site for no real purpose. Cf. General Casualty Co. v. United States, 127 F.Supp. 805, 812–813, 130 Ct.Cl. 520, 533, cert. denied 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955). Plaintiff's estimator acted reasonably in discussing the matter with Lt. Paynic at the Loring jobsite, and in believing, after the conversation between him and the Technical Representative, that plaintiff had correctly interpreted the invitation for bids. The statements of the Technical Representative cannot be completely disavowed and repudiated on the ground that he was without authority to speak for the contracting officer. *General Casualty Co., supra.* When an official of the contracting agency is not the contracting officer, but has been sent by the contracting officer for the express purpose of giving guidance in connection with the contract, the contractor is justified in relying on his representations. Fox Valley Eng'r, Inc. v. United States, 151 Ct.Cl. 228, 240 (1960).[6]

■ It is recognized that a bidder, who is on notice of an incipient problem but neglects to solve it as he is directed to do, cannot rely on the principle that ambiguities in contracts written by the Government are held against the Government. The bidder in such case is under an affirmative obligation to make appropriate inquiries in an effort to obtain clarification of a seeming ambiguity. Ring Constr. Corp. v. United States,

6. This conclusion does not contravene the "Explanation to Bidders", in the Instructions to Bidders (quoted *supra*), which states: "Oral explanations or instructions given before the award of the contract will not be binding". This provision means that the government is not to be estopped by such oral explanations or instructions which conflict with or depart from the specifications or the contract. The provision does not mean that the bidder cannot take into account, in determining what the specifications reasonably call for, the statements made by a knowledgeable government official, who is representing the contracting officer, which appear to be in conformity with the plans, specifications, and contract. [Footnote by the court.]

162 F.Supp. 190, 192, 142 Ct.Cl. 731, 734 (1958). The contractor cannot bridge the gap in his own favor when presented with an obvious omission, inconsistency, or discrepancy of significance. Beacon Constr. Co. v. United States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 6–7 (1963).

■ The words "obvious omission, inconsistency, or discrepancy of significance" in *Beacon* must be emphasized; however, it is not every possible ambiguity or doubt which imposes a duty on the contractor to make formal inquiry. W. G. Cornell Co. v. United States, 376 F.2d 299, 310, 179 Ct.Cl. 651, 668 (1967). A potential contractor is not required to seek clarification of all possible differences in interpretation. *Cf.* WPC Enterprises, Inc. v. United States, 323 F.2d 874, 877, 163 Ct.Cl. 1, 6 (1963). What constitutes the type of omission sufficient to put plaintiff under obligation to make inquiries cannot be defined generally, but on an ad hoc basis of looking to what a reasonable man would find to be patent and glaring. L. Rosenman Corp. v. United States, 390 F.2d 711, 713, 182 Ct.Cl. 586, 590 (1968).

In the instant case, plaintiff had interpreted the invitation for bids as excluding the painting of the wood sashes beneath the storm windows. It had ascertained no ambiguity on the face of the specifications. Upon visiting the jobsite, plaintiff's representative had its contract interpretation confirmed by the draftsman of the contract specifications. Had Lt. Paynic told plaintiff that the wood sashes *were* to be painted, an obvious ambiguity calling for formal, written inquiry to the contracting officer would have arisen. But the Lieutenant agreed with plaintiff, which had no notice of any incipient problem.

Defendant suggests that Southern Constr. Co. v. United States, 364 F.2d 439, 453, 176 Ct.Cl. 1339, 1361–1362 (1966), is dispositive on the issue of ambiguity. *Southern* was an action against the United States for the recovery of allegedly increased painting costs incurred when defendant required the painting of certain previously unpainted interior plaster surfaces. The plaintiff there contended that these areas were not included in the specifications. The contract specifications in that case included, *inter alia*, the following language:

3–11. *Interior Painting:*

*a. General.* Materials within interior spaces unless otherwise specified, shall receive paint and enamel to match existing and shall include * * plaster * * *.

*b. Areas and surfaces to receive paint shall be painted as follows:*

(1) Plaster * * *.

Similarly, the item "SURFACES NOT TO BE PAINTED" did not mention plaster surfaces.

On the strength of the above, and similar evidence, this court, 364 F.2d at page 453, 176 Ct.Cl. at page 1362, found that:

* * * The provisions of the * * pertinent specifications expressly cover the subject matter as to what areas and surfaces are to be painted or left unpainted, and such section clearly and unambiguously requires painting of the previously unpainted plaster surfaces. * * * Plaintiff's interpretation cannot be accepted as reasonable because it would write out of * * * [the specifications] the clear provisions to the contrary and would do violence to the whole format of the specifications. * * *

It was *after* it sifted the facts that this court in *Southern* concluded that plaintiff's interpretation was not reasonable. As in the case of *Watson-Warren*, *supra*, the fact pattern is not analogous to the instant case. Plaster was specifically mentioned in the contract in *Southern*. Wood sashes were omitted in the contract involved in the instant case.

 Further, it was not alleged in *Southern,* as here, that plaintiff's interpretation was reinforced by the actions of Government personnel. The unusual status of Lt. Paynic in relation to the contract cannot be ignored. At the minimum, his statements on the exclusion of the wood sashes from the contract are indicative that plaintiff's contract interpretation was a reasonable one. The Technical Representative, and plaintiff, may, *arguendo,* have erred. However, parties to a contract drafted by the Government do not bear the burden of correctly interpreting the same, only of reasonably interpreting it. A contract is ambiguous when it can be "read so as to reasonably sustain defendant's interpretation of it, just as it could be read so as to reasonably sustain * * [plaintiff's] construction * * *." Such a contract must be resolved against the drafter. Sun Shipbuilding, *supra,* 393 F.2d at p. 815, 183 Ct.Cl. at page 372.

In Kraus v. United States, 366 F.2d 975, 177 Ct.Cl. 108 (1966), a Government field inspector had expressly agreed with plaintiff's interpretation of the requirements of a supply contract drawn by defendant. The Government later contended that this interpretation was erroneous, and the ASBCA agreed. This court reversed the Board and stated, 366 F.2d at page 981, 177 Ct.Cl. at page 118:

> * * * If plaintiff's error was so glaringly obvious or patent that he should have discovered it or made inquiry of the contracting officer, we find it difficult to understand why such a well-qualified representative of the defendant made the same mistake. Even if the inspector had no authority to supply a binding interpretation of the contract, his actions constitute highly persuasive evidence of the reasonableness of plaintiff's interpretation.

The analogy of *Kraus* to the instant case is clear.

There is nothing in the record of this case, other than the bare language of the contract itself, to indicate that at the time the contract in this case was entered into, the Government considered the specifications to include the painting of the wooden sashes beneath the aluminum storm windows. This court has stated that "[a]lthough the specifications and drawings may have been clear as a bell in the mind of defendant's architect, it is not the subjective intent that is the legal determinant." *L. Rosenman Corp., supra,* 390 F.2d at 714, 182 Ct.Cl. at page 590. In the instant case, the intent of defendant's "architect," *i. e.,* Lt. Paynic, *is* known. Yet the Board finds the contract to unambiguously mean something contrary. If the undisclosed intent of the actual draftsman is of little weight in contract interpretation, should the undisclosed opinion of the Government—whomever that is— be placed in higher esteem?

 Neither party to this case has explored or briefed the question of the status of a storm window affixed to a building in the manner described by the Board. According to a leading authority, "[w]indow screens and storm windows and doors specially fitted are unquestionably fixtures." R. Brown, The Law of Personal Property, 721–722 (2d ed. 1955). The Board found that the storm window frames involved here "were not readily removable" although the glass windows themselves were of a removable type. According to Professor Brown, storm windows are part of the realty, even if fastened "loosely and temporarily," *Brown, supra,* at p. 707, and would pass with a conveyance of the freehold, though the "conveyance might be made in summer when the same were stored in basement or attic." *Brown, supra,* at p. 712. *Cf.* Roderick v. Sanborn, 106 Me. 159, 76 A. 263 (1910); Metropolitan Life Ins. Co. v. Jensen, 69 S.D. 225, 9 N.W.2d 140 (1943). Since a fixture is deemed to be physically annexed to the realty, it may be argued that the exterior of a storm window is permanently the exterior window of a building. While it is unnecessary to decide whether the storm windows involved in

the instant case were a part of the realty in order to justify the result reached here, the foregoing discussion bolsters the holding that the contract specifications in question were ambiguous and that plaintiff's interpretation thereof was reasonable.

It is possible to contend, as defendant does, that the window *beneath* the storm window is an exterior surface. Such contention, even if correct, is not clearly and unambiguously so. If the Government believed, at the time the specifications were drafted in this case, that there were two sets of exterior windows, or that the obviously exterior storm windows were to be placed in some other category, it should have specifically said so.

Defendant's order to plaintiff that it was required to paint the wood sashes constituted a change, for which plaintiff may be equitably compensated providing damages can be proven. When the extent of contract work is not clearly set forth in that instrument then an order to do the work is in legal effect a change. *Ring Constr. Co., supra,* 162 F.Supp. at 191, 142 Ct.Cl. at page 733.

The determination of the equitable adjustment, if any, due plaintiff for the change cannot be made in the first instance in this court under the facts present here. United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966). The ASBCA will have to make the determination, either on the present record or after further evidence is introduced before the Board. Bell v. United States, 404 F. 2d 975, 984, 186 Ct.Cl. 189, 206 (1968).

## CONCLUSION

Therefore plaintiff's motion for summary judgment is granted, defendant's cross-motion for summary judgment is denied, judgment is entered for plaintiff and further proceedings are stayed pursuant to Rule 167 for a period of 90 days to afford the parties an opportunity to obtain an administrative resolution of the amount of the equitable adjustment to which plaintiff is entitled.